Khesraw Karmand (SBN 280272)
kkarmand@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497

***Attorneys for Plaintiff***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| D'ANN M. PATTERSON, individually, on behalf of all others similarly situated, and in her derivative capacity on behalf of the Capital Retirement Savings Plan, | No. |
| | **COMPLAINT** |
| Plaintiff, | |
| v. | |
| THE CAPITAL GROUP COMPANIES, INC., THE BOARD OF DIRECTORS OF THE CAPITAL GROUP COMPANIES, INC., THE U.S. RETIREMENT BENEFITS COMMITTEE OF THE CAPITAL RETIREMENT SAVINGS PLAN, CAPITAL GUARDIAN TRUST COMPANY, CAPITAL RESEARCH & MANAGEMENT COMPANY, CAPITAL INTERNATIONAL, INC., AND JOHN DOE DEFENDANTS 1-50, | |
| Defendants. | |

## I.   INTRODUCTION

1.    Plaintiff D'Ann Patterson ("Plaintiff"), individually, in her derivative capacity on behalf of the Capital Retirement Savings Plan ("Plan"), and on behalf of all other similarly situated participants and beneficiaries of the Plan, brings this action against The Capital Group Companies, Inc. ("Capital Group"), the Board of Directors of Capital Group (the "Board"), the U.S. Retirement Benefits Committee (the "Committee") of the Plan, Capital Guardian Trust Company ("CGTC"), Capital Research and Management Company ("CRMC"), Capital International, Inc. ("CII"), and John Doe Defendants 1-50 (collectively, "Defendants").

## II.   NATURE OF ACTION

2.    This action is brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for violations of ERISA's fiduciary duties and prohibited transaction provisions between June 13, 2011, and the present (the "Relevant Period"). Plaintiff is a participant of the Plan, a defined contribution plan sponsored by Capital Group. Plaintiff seeks to redress losses to the Plan and the Plan participants' accounts that were invested in the challenged investment options, obtain Plan-wide injunctive relief, and secure disgorgement of unjust profits pursuant to ERISA §§ 409, 29 U.S.C. § 1109, and 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3).

3.    The losses to the Plan, the harm to the retirement savings of Plan participants and beneficiaries, and the windfall profits to Capital Group and its subsidiaries—CGTC, CRMC, and CII—are the result of conflicted, disloyal, imprudent, and self-interested decisions by the Committee, with respect to the selection, evaluation, monitoring, and retention of the investment options offered by the Plan and the investment of the Plan

2

assets. ERISA requires that the Committee act prudently and solely in the interests of the Plan and its participants and beneficiaries when selecting and retaining investment options for the Plan. The Committee did not do so. Instead, the Committee put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries by selecting, retaining, and failing to remove the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII that generate significant revenue for Capital Group and its subsidiaries.

4.      During the Relevant Period, between **94.7% and 97.8%** of all investment options offered by the Plan were the unduly expensive **Capital Group-affiliated** investment options managed by CGTC, CRMC, and/or CII. These investment options were not selected and retained as a result of an impartial or prudent process, but were instead selected and retained by the Committee because Capital Group and its subsidiaries benefited financially from their inclusion in the Plan.

5.      Purportedly acting on behalf of the Plan, the Committee selected and retained the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, despite having access to comparable investment options from unaffiliated companies that cost less and have performed comparably to, if not better than, the unduly expensive Capital Group-affiliated investment options in the Plan. Moreover, the Committee selected and retained the more expansive R5 share class of the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII for a number of years despite the availability of the less expensive R6 share class.[1]

---

[1]  As discussed in Section V.B. *infra*, while the R6 share class of the Capital-Group affiliated investment options challenged herein is less expensive than the R5 share class, it is still unduly more expensive than comparable investment options available from

6.     The Committee's conflicted, disloyal, imprudent, and self-interested decisions—and its failure to properly evaluate and monitor the Plan's investment options for both reasonable costs and performance levels through an impartial or prudent process—resulted in Plan participants and beneficiaries paying excessive and prohibited fees that substantially diminished their retirement savings, and resulted in windfall profits for Capital Group and its subsidiaries.

7.     Moreover, the conflicted, disloyal, imprudent, and self-interested decisions of CGTC with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund (a Capital Group-affiliated collective investment trust), for which Plan assets CGTC was a fiduciary, also resulted in Plan participants and beneficiaries paying excessive and prohibited fees that substantially diminished their retirement savings, and resulted in windfall profits for Capital Group and its subsidiaries, including CGTC.

8.     The Committee and CGTC therefore breached their fiduciary duties of loyalty and prudence—the highest duties known to the law—in violation of ERISA § 404, 29 U.S.C. § 1104, and engaged in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.

9.     Further, the Board—which had the discretion, authority, and responsibility to appoint the members of the Committee—breached its duty to monitor the Committee members in their performance of their fiduciary functions.

10.     Despite knowing of the breaches of fiduciary duties and prohibited transactions, the Board, the Committee, and CGTC failed to prevent them in violation of

unaffiliated companies during the Relevant Period. As such, the Plan's investments in the R6 share class have continued to result in losses to the Plan and its participants and beneficiaries, and unjust windfalls for Defendants.

ERISA § 405, 29 U.S.C. § 1105, and are therefore liable for the fiduciary breaches and the prohibited transactions at issue as co-fiduciaries.

11.     Finally, Capital Group, CGTC, CRMC, and CII are liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to disgorge the ill-gotten gains and provide other appropriate equitable relief for participating in the fiduciary breaches of the Board, the Committee, and/or CGTC, as well as the prohibited transactions alleged herein.

## III.    JURISDICTION AND VENUE

12.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

13.     **Personal Jurisdiction.** This Court has personal jurisdiction over all Defendants because they are all residents of the United States or are subject to service in the United States and ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

14.     **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, Defendants reside and/or transact business in this District, and Defendants have their principal place of business in this District.

## IV.    PARTIES

**A.    Plaintiff**

15.     **Plaintiff D'Ann M. Patterson.** Plaintiff is domiciled in and a resident of Gardena, Los Angeles County, California. During the Relevant Period, Plaintiff has been a participant in the Plan and invested in the unduly expensive Capital Group-affiliated investment options in the Plan, including the AMCAP Fund, the CG Emerging Markets

Growth Fund, the EuroPacific Growth Fund, the Growth Fund of America, the New Economy Fund, the New Perspective Fund, the New World Fund, the SMALLCAP World Fund, the American Mutual Fund, the Capital World Growth and Income Fund, Fundamental Investors, the International Growth and Income Fund, the Investment Company of America, the Washington Mutual Fund, Capital Income Builder, the Income Fund of America, the American Balanced Fund, the American Funds Global Balanced Fund, the American High-Income Trust, the Bond Fund of America, the Capital World Bond, the Intermediate Bond Fund of America, the Short-Term Bond Fund of America, the U.S. Government Securities Fund, the American Funds Mortgage Fund, the America Funds U.S. Government Money Market Fund, and the American Funds 2030 Target Date Retirement Fund.

**B.     Defendants**

16.     **Defendant The Capital Group Companies, Inc. (defined above as "Capital Group").** Capital Group is a financial services company that provides investment management services through its subsidiaries, including CGTC, CRMC, and CII. Capital Group ranks among the largest investment management companies world-wide with $1.39 trillion in assets under management, and has offices in the Americas, Asia, Australia, and Europe. Capital Group offers a range of financial products and services, including the "American Funds" family of mutual funds, separately managed accounts, and collective investment trusts. Capital Group is a Delaware corporation and is headquartered in Los Angeles, California. Pursuant to the written instrument of The Capital Retirement Savings

6

Plan, effective May 31, 2014 ("Plan Document"), Capital Group is the Plan sponsor.[2]  *Id.* at 1.

17.      **Defendant U.S. Retirement Benefits Committee (defined above as the "Committee").** Pursuant to the Plan Document, the Committee is the Plan administrator and a named fiduciary of the Plan. *Id.*, § 1.8, 17.2(a). The Committee consists of at least five members appointed by the Board. *Id.*, § 15.1(a). Any officer, director, or employee of Capital Group or its affiliates is eligible to serve as a member of the Committee. *Id.* The Committee has the "exclusive authority and discretion to control and manage the operation and administration of the Plan." *Id.*, § 17.2(a). This authority and discretion includes management of the Plan's investment options. Specifically, the Committee has full discretionary power and authority to, *inter alia*: (1) select, evaluate, monitor, retain, and remove the investment options offered by the Plan; (2) engage actuaries, attorneys, accountants, appraisers, brokers, consultants, administrators, or other firms or persons and (with its officers, directors and employees); (3) adopt such procedures that are not inconsistent with the Plan or applicable law and amend or revoke any such procedures; (4) construe the Plan and the procedures of the Plan; (5) make findings of fact as necessary to make any determinations and decisions in the exercise of such discretionary power and authority; and (6) delegate any power or duty to any firm or person engaged for reports, advice, opinions, or valuations, or to any other person or persons. *Id.*, §§ 1.25, 15.2.  As discussed herein and in Section VI.C. *infra*, the Committee is both a named fiduciary under

---

[2] Plaintiff reserves the right to amend to bring additional claims against Capital Group should further investigation or discovery reveal that Capital Group was a fiduciary with respect to the Plan.

ERISA § 402(a), 29 U.S.C. § 1102(a), and a functional fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

18.     **Defendant Board of Directors of Capital Group (defined above as the "Board").** Pursuant to the Plan Document, the Board has the authority and discretion to appoint and remove members of the Committee by resolution. *Id.*, § 15.1(a). As discussed in Section VI.C. *infra*, the Board is a functional fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

19.     **Defendant Capital Guardian Trust Company (defined above as "CGTC").** CGTC, a wholly owned subsidiary of Capital Group, is a privately owned investment management company and offers trust and investment management services to pension plans, 401(k) plans, charitable organizations, state and municipal government entities, endowments, and other institutional and individual investors. CGTC is a California corporation and is headquartered in Los Angeles, California. Pursuant to the Plan Document, CGTC is the trustee of the Plan. *Id.*, § 1.39. As the Plan trustee, CGTC has "[t]he sole power and discretion to manage and control the Plan's assets, including, but not limited to, the power to acquire and dispose of Plan assets." *Id.*, § 17.2(b)(i). CGTC is also the investment adviser of the Capital Guardian Emerging Markets Equity Fund, an unduly expensive Capital Group-affiliated investment option offered by the Plan until late 2015 or early 2016, and CGTC had discretion and authority over the Plan assets invested in it. As discussed in Section VI.C. *infra*, CGTC is a functional fiduciary with respect to the Plan

assets invested in the Capital Guardian Emerging Markets Equity Fund under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).[3]

20.     **Defendant Capital Research and Management Company (defined above as "CRMC").** CRMC, a wholly owned subsidiary of Capital Group, is a privately owned investment management company that manages the "American Funds" family of mutual funds. CRMC is a Delaware corporation and is headquartered in Los Angeles, California. CRMC is the investment adviser of 42 of the unduly expensive Capital Group-affiliated investment options offered by the Plan.[4]

21.     **Defendant Capital International, Inc. (defined above as "CII").** CII, a wholly owned subsidiary of Capital Group, is a privately owned investment management company and offers investment management services to pension plans, 401(k) plans, charitable organizations, state and municipal government entities, public funds, and other institutional and individual investors. CII is a California corporation and is headquartered in Los Angeles, California. CII is the investment adviser of the CG Emerging Markets Growth Fund, an unduly expensive Capital Group-affiliated investment option offered by the Plan since late 2015 or early 2016.[5]

22.     **John Doe Defendants 1-25.** John Doe Defendants 1-25 are individuals, the identities of whom are currently unknown to Plaintiff, responsible for carrying out the

---

[3] Plaintiff reserves the right to amend to bring additional claims against CGTC should further investigation or discovery reveal that CGTC was a fiduciary with respect to the Plan beyond its fiduciary obligations, as set forth herein, with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund.

[4] Plaintiff reserves the right to amend to bring additional claims against CRMC should further investigation or discovery reveal that CRMC was a fiduciary with respect to Plan.

[5] Plaintiff reserves the right to amend to bring additional claims against CII should further investigation or discovery reveal that CII was a fiduciary with respect to the Plan.

9

fiduciary tasks of the Board, the Committee, and/or CTGC in connection with the administration and/or management of the Plan.[6] Because ERISA provides for individual as well as entity liability, they are fiduciaries to the extent that they carried out the aforementioned entities' fiduciary responsibilities. Additionally, as officers, directors, or employees of Capital Group and/or its subsidiaries, acting on behalf of their employer in a fiduciary capacity, the ERISA violations by John Doe Defendants 1-25 are also the liability of their employer under both principles of agency and the doctrine of *respondeat superior*. Plaintiff reserves the right to amend to identify the John Doe Defendants 1-25 as appropriate.

23.    **John Doe Defendants 26-50**. John Doe Defendants 26-50 are individuals, the identities of whom are currently unknown to Plaintiff, responsible for carrying out the tasks of Capital Group, CRMC, and CII, who participated and/or profited from the breaches of loyalty alleged in Count One, the breaches of prudence alleged in Count Two, and the prohibited transaction claims alleged in Counts Three and Four. Additionally, as officers, directors, or employees of Capital Group and/or its subsidiaries, acting on behalf of their employer, the ERISA violations by John Doe Defendants 26-50 are also the liability of their employer under both principles of agency and the doctrine of *respondeat* superior. Plaintiff reserves the right to amend to identify the John Doe Defendants 26-50 as appropriate.

---

[6] As noted above, CGTC is a fiduciary to the Plan with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund.

## V.   THE PLAN

### A.   The Plan's Structure

24.   The Plan, sponsored by Capital Group, is a "defined contribution plan" as defined by ERISA § 3(34), 29 U.S.C. 1002(34). Pursuant to ERISA § 409, 29 U.S.C. § 1109, the relief requested in this action is on behalf of the Plan for the benefit of the Plan and its participants and beneficiaries.

25.   Employees are eligible to participate in the Plan immediately if they are salaried employees of Capital Group or a participating affiliate, who receive pay from the U.S. payroll during the Plan year.

26.   Eligible employees are automatically enrolled in the Plan at a three percent (3%) contribution rate unless they elect a different rate or opt out of the Plan. If employees fail or decline to elect investment options to allocate their savings, their contributions are invested in a Target Date Fund determined by the Committee.

27.   Employees can contribute up to 75% of their eligible compensation on a pre-tax and/or Roth 401(k) basis, subject to the annual legal limits provided in the Internal Revenue Code.

28.   Capital Group and participating affiliates make an annual contribution on behalf of their employees up to 15% of the employee's compensation, provided that the employee is employed by Capital Group or a participating affiliate on the last day of the Plan year.

29.   Employees are always 100% vested in the value of their own contributions. Employees are vested in the value of contributions by Capital Group or participating affiliates in the following percentages after the indicated years of services:  10% (one year),

11

20% (two years), 40% (three years), 60% (four years), 80% (five years), and 100% (six or more years).

**B.    The Plan's Investment Options**

30.    According to the Plan's Form 5500s filed with the Department of Labor ("DOL"), during the Relevant Period, the Plan has offered between 38 and 46 investment options.[7] During the Relevant Period, the Plan's investment options have consisted of a mixture of three types of mutual funds—Core funds, Portfolio Series funds, and Target Date funds—and a collective investment trust.

31.    As noted above, during the Relevant Period, between ***94.7% and 97.8%*** of the investment options offered by the Plan were the unduly expensive Capital Group-affiliated investment options managed by CTGC, CRMC, and/or CII, as detailed in the table below.

| Plan Year | Total Plan Investment Options | No. of Capital Group-Affiliated Investment Options | % of Capital Group-Affiliated Investment Options |
|---|---|---|---|
| 2011 | 38 | 36 | 94.7% |
| 2012 | 44 | 42 | 95.5% |
| 2013 | 44 | 42 | 95.5% |
| 2014 | 44 | 43 | 97.7% |
| 2015 | 45 | 44 | 97.8% |
| 2016 | 46 | 44 | 95.7% |

---

[7] During the Relevant Period, the Plan also offered the American Funds U.S. Government Money Market Fund, the JPMorgan U.S. Treasury Plus Money Market Fund, and the JPMorgan U.S. Treasury Plus Money Market Fund Forfeiture as investment options. The American Funds U.S. Government Money Market Fund is a Capital Group-affiliated mutual fund managed by CRMC. According to the Plan's Form 5500s filed with the DOL, JPMorgan Chase and Company is the custodian of the Plan and a party in interest. Plaintiff reserves the right to amend to bring claims with respect to these investment options, should further investigation or discovery reveal any breach of fiduciary duties or prohibited transactions by Defendants and/or JPMorgan Chase and Company with regard to these two investment options.

12

32.     The Plan's investment options are subject to investment management fees, which are usually charged against the assets of the investment options. The amount of fees differs by the investment option. An investment option that is managed as an index fund will likely have lower investment management fees and transactional costs as compared to an actively managed investment option. These fees and transactional costs can have a significant impact on a participant's rate of return.

33.     During the Relevant Period, between **99.7% and 99.9%** of the Plan assets—totaling between approximately $1.6 billion and $3 billion—were invested in the unduly expensive Capital Group-affiliated investment options, as noted in the table below.

| Plan Year | Total Plan Assets | Plan Assets in Capital Group-Affiliated Investment Options | % of Plan Assets in Capital Group-Affiliated Investment Options |
|---|---|---|---|
| 2011 | $1,650,507,869 | $1,646,307,254 | 99.7% |
| 2012 | $1,619,998,799 | $1,617,622,620 | 99.9% |
| 2013 | $1,873,648,636 | $1,870,970,791 | 99.9% |
| 2014 | $2,881,316,504 | $2,876,935,910 | 99.8% |
| 2015 | $3,008,771,403 | $3,000,396,915 | 99.7% |
| 2016 | $3,029,103,964 | $3,026,328,490 | 99.9% |

### 1.     **Core Funds**

34.     The Core funds are the Plan's core mutual fund offerings. Core mutual funds are devoted to providing safe stock investments for investors and are designed to profit primarily from dependable dividends from companies that are stable enough to avoid any major changes in the future.

35.     During the Relevant Period, the Plan has offered between 27 and 28 Core funds.

13

### a.    AMCAP Fund

36.    The AMCAP Fund is a mutual fund managed by CRMC.

37.    The AMCAP Fund's investment strategy is to invest primarily in the common stocks of U.S. companies that have solid long-term growth records and the potential for strong future growth.

38.    The AMCAP Fund's objective is to provide investors with long-term growth of capital.

39.    Prior to 2014, the Plan offered the R5 share class of the AMCAP Fund (RAFFX), which charges an expense ratio of 42 basis points. In 2014, the Plan switched to the less expensive R6 share class of the AMCAP Fund (RAFGX), which charges an expense ratio of 37 basis points.

40.    Although the R6 share class of the AMCAP Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the AMCAP Fund in the Plan until 2014.

41.    During the Relevant Period, the Plan has had between $45 million and $139 million of its assets invested in the AMCAP Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $45 M |
| 2012 | $49 M |
| 2013 | $59 M |
| 2014 | $119 M |
| 2015 | $139 M |
| 2016 | $133 M |

42.    The fees charged to Plan participants and beneficiaries for these investments in the AMCAP Fund were and continue to be well in excess of the fees charged by the

unaffiliated companies for comparable mutual funds.[8] For example, the Vanguard Growth Fund (VWUAX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 32 basis points, 23% less than what is charged by the R5 share class of the AMCAP Fund, and 13% less than what is charged by the R6 share class of the AMCAP Fund. The Vanguard Growth Index Fund (VIGAX)—a passively managed fund with a similar investment strategy and objective—charges an expense ratio of 8 basis points, 80% less than what is charged by the R5 share class of the AMCAP Fund, and 78% less than what is charged by the R6 share class of the AMCAP Fund.

43.    While the performance of the Vanguard funds has been comparable to that of the AMCAP Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| AMCAP Fund (R5) | 14.83% | 8.31% | 15.29% |
| AMCAP Fund (R6) | 14.84% | 8.36% | 15.33% |
| Vanguard Growth Fund | 16.28% | 11.09% | 16.03% |
| Vanguard Growth Index Fund | 19.89% | 11.19% | 15.64% |

44.    The Committee could have selected and retained a mutual fund comparable to the AMCAP Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so

---

[8] The comparable investment options alleged herein are not meant to be exhaustive, but instead to demonstrate the availability of significantly less-expensive alternatives that the Committee could have selected and retained for the Plan had it utilized an impartial or prudent process in selecting, evaluating, monitoring, and retaining the Plan's investment options. Plaintiff will provide expert analysis in this regard at the appropriate time, as warranted.

because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

45.     Moreover, as noted above, the Committee retained the more expensive R5 share class of the AMCAP Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.[9]

### b.    CG Emerging Markets Growth Fund[10]

46.     The CG Emerging Markets Growth Fund is a mutual fund managed by CII.

47.     The CG Emerging Markets Growth Fund's investment strategy is to invest primarily in the common stock and other equity securities of issues in developing countries (*i.e.*, "emerging markets").

48.     The CG Emerging Markets Growth Fund's objective is to provide investors with long-term capital growth.

49.     In late 2015 or early 2016, the CG Emerging Markets Growth Fund was added as a Plan investment option. The CG Emerging Markets Growth Fund (EMRGX) charges an expense ratio of 80 basis points.

---

[9] As noted in footnote 1 *supra*, the R6 share class of the Plan investment options challenged herein is less expensive than the R5 share class, but it is still unduly more expensive than the comparable investment options available from unaffiliated companies during the Relevant Period.

[10] The CG Emerging Markets Growth Fund is referred to as the Emerging Markets Growth Fund, Inc. in its prospectus and the Plan's Form 5500s.

50.     During the Relevant Period, the Plan has had approximately $90 million of its assets invested in the CG Emerging Markets Growth Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2015 | $90 M |
| 2016 | $90 M |

51.     The fees charged to Plan participants and beneficiaries for these investments in the CG Emerging Markets Growth Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. Although Vanguard does not offer an actively managed fund with a similar investment strategy and objective that costs less than the CG Emerging Markets Growth Fund, it does offer the Vanguard Emerging Markets Stock Index Fund (VEMAX)—a passively managed fund with a similar investment strategy and objective—which charges an expense ratio of 14 basis points, more than 82% less than what is charged by the CG Emerging Markets Growth Fund.

52.     While the performance of the Vanguard Emerging Markets Stock Index Fund has been comparable to that of the CG Emerging Markets Growth Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard Emerging Markets Stock Index Fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| CG Emerging Markets Growth Fund | 27.60% | 1.02% | 3.69% |
| Vanguard Emerging Markets Stock Index Fund | 23.98% | 1.40% | 4.18% |

53.     The Committee could have selected and retained a mutual fund comparable to the CG Emerging Markets Growth Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it

17

chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

### c. EuroPacific Growth Fund

54.     The EuroPacific Growth Fund is a mutual fund managed by CRMC.

55.     The EuroPacific Growth Fund's investment strategy is to invest primarily in the common stocks of issuers in Europe and the Pacific Basin that have the potential for growth.

56.     The EuroPacific Growth Fund's objective is to provide investors with long-term growth of capital.

57.     Prior to 2014, the Plan offered the R5 share class of the EuroPacific Growth Fund (RERFX), which charges an expense ratio of 54 basis points. In 2014, the Plan switched to the less expensive R6 share class of the EuroPacific Growth Fund (RERGX), which charges an expense ratio of 49 basis points.

58.     Although the R6 share class of the EuroPacific Growth Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the EuroPacific Growth Fund in the Plan until 2014.

59.     During the Relevant Period, the Plan has had between $93 million and $156 million of its assets invested in the EuroPacific Growth Fund, as follows.

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $114 M |
| 2012 | $93 M |
| 2013 | $98 M |
| 2014 | $151 M |
| 2015 | $156 M |
| 2016 | $126 M |

18

60.     The fees charged to Plan participants and beneficiaries for these investments in the EuroPacific Growth Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard International Growth Fund (VWILX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 33 basis points, 38% less than what is charged by the R5 share class of the EuroPacific Growth Fund, and 32% less than what is charged by the R6 share class of the EuroPacific Growth Fund. The Vanguard Total International Stock Index Fund (VTIAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 11 basis points, 79% less than what is charged by the R5 share class of the EuroPacific Growth Fund, and 77% less than what is charged by the R6 share class of the EuroPacific Fund.

61.     While the performance of the Vanguard funds has been comparable to that of the EuroPacific Growth Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| EuroPacific Growth Fund (R5) | 18.55% | 3.66% | 10.42% |
| EuroPacific Growth Fund (R6) | 18.59% | 3.71% | 10.47% |
| Vanguard International Growth Fund | 25.97% | 5.32% | 11.81% |
| Vanguard Total International Stock Index Fund | 18.29% | 1.75% | 8.83% |

62.     The Committee could have selected and retained a mutual fund comparable to the EuroPacific Growth Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to

select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

63.     Moreover, as noted above, the Committee retained the more expensive R5 share class of the EuroPacific Growth Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### d.     The Growth Fund of America

64.     The Growth Fund of America is a mutual fund is managed by CRMC.

65.     The Growth Fund of America's investment strategy is to invest primarily in the common stock of large and mid-capitalization issues that appear to offer superior opportunities for growth of capital.

66.     The Growth Fund of America's objective is to provide investors with growth of capital.

67.     Prior to 2014, the Plan offered the R5 share class of the Growth Fund of America (RGAFX), which charges an expense ratio of 39 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Growth Fund of America (RGAGX), which charges an expense ratio of 33 basis points.

68.     Although the R6 share class of the Growth Fund of America was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Growth Fund of America in the Plan until 2014.

69.     During the Relevant Period, the Plan has had between $125 million and $269 million of its assets invested in the Growth Fund of America, as follows:

20

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $129 M |
| 2012 | $125 M |
| 2013 | $149 M |
| 2014 | $254 M |
| 2015 | $269 M |
| 2016 | $260 M |

70.     The fees charged to Plan participants and beneficiaries for these investments in the Growth Fund of America were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Growth and Income Fund (VGIAX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 23 basis points, 41% less than what is charged by the R5 share class of the Growth Fund of America, and 30% less than what is charged by the R6 share class of the Growth Fund of America. The Vanguard 500 Index Fund (VFIAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 4 basis points, 89% less than what is charged by the R5 of Growth Fund of America, and 87% less than what is charged by the R6 share class of the Growth Fund of America.

71.     While the performance of the Vanguard funds has been comparable to that of the Growth Fund of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| The Growth Fund of America (R5) | 20.98% | 11.08% | 16.64% |
| The Growth Fund of America (R6) | 21.03% | 11.13% | 16.70% |
| Vanguard Growth and Income Fund | 16.53% | 10.12% | 15.59% |

21

| Vanguard 500 Index Fund | 17.43% | 10.10% | 15.38% |

72.     The Committee could have selected and retained a mutual fund comparable to the Growth Fund of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

73.     Moreover, as noted above, the Committee retained the more expensive R5 share class of the Growth Fund of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### e.     The New Economy Fund

74.     The New Economy Fund is a mutual fund managed by CRMC.

75.     The New Economy Fund's investment strategy is to invest in the securities of companies that can benefit from innovation, exploit new technologies, or provide products and services that meet the demands of an evolving global economy.

76.     The New Economy Fund's objective is to provide investors with long-term growth of capital and current income.

77.     Prior to 2014, the Plan offered the R5 share class of the New Economy Fund (RNGFX), which charges an expense ratio of 52 basis points. In 2014, the Plan switched to the less expensive R6 share class of the New Economy Fund (RNGGX), which charges an expense ratio of 46 basis points.

22

78.     Although the R6 share class of the New Economy Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the New Economy Fund in the Plan until 2014.

79.     During the Relevant Period, the Plan has had between $48 million and $129 million of its assets invested in the New Economy Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $48 M |
| 2012 | $48 M |
| 2013 | $63 M |
| 2014 | $125 M |
| 2015 | $129 M |
| 2016 | $111 M |

80.     The fees charged to Plan participants and beneficiaries for these investments in the New Economy Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Global Minimum Volatility Fund (VMNVX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 67% less than what is charged by the R5 share class of the New Economy Fund, and 63% less than what is charged by the R6 share class of the New Economy Fund. The Vanguard Total World Stock Index Fund (VTWSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 21 basis points, 59% less than what is charged by the R5 share class of the New Economy Fund, and 54% less than what is charged by the R6 share class of the New Economy Fund.

81.     While the performance of the Vanguard funds has been comparable to that of the New Economy Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a

higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Years | 3 Years | 5 Years |
|---|---|---|---|
| The New Economy Fund (R5) | 21.14% | 8.08% | 16.39% |
| The New Economy Fund (R6) | 21.19% | 8.12% | 16.45% |
| Vanguard Global Minimum Volatility Fund | 14.54% | 10.77% | N/A |
| Vanguard Total World Stock Index Fund | 17.75% | 5.58% | 11.80% |

82.     The Committee could have selected and retained a mutual fund comparable to the New Economy Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

83.     Moreover, as noted above, the Committee retained the more expensive R5 share class of the New Economy Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### f.     The New Perspective Fund

84.     The New Perspective Fund is a mutual fund managed by CRMC.

85.     The New Perspective Fund's investment strategy is to invest primarily in the common stocks that have the potential for growth.

86.     The New Perspective Fund's objective is to provide investors with long-term growth of capital with future income being a secondary objective.

24

87.     Prior to 2014, the Plan offered the R5 share class of the New Perspective Fund (RNPFX), which charges an expense ratio of 50 basis points. In 2014, the Plan switched to the less expensive R6 share class of the New Perspective Fund (RNPGX), which charges an expense ratio of 45 basis points.

88.     Although the R6 share class of the New Perspective Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the New Perspective Fund in the Plan until 2014.

89.     During the Relevant Period, the Plan has had between $76 million and $146 million of its assets invested in the New Perspective Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $82 M |
| 2012 | $76 M |
| 2013 | $91 M |
| 2014 | $140 M |
| 2015 | $146 M |
| 2016 | $139 M |

90.     The fees charged to Plan participants and beneficiaries for these investments in the New Perspective Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Global Minimum Volatility Fund (VMNVX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 66% less than what is charged by the R5 share class of the New Perspective Fund, and 62% less than what is charged by the R6 share class of the New Perspective Fund. The Vanguard Total World Stock Index Fund (VTWSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 21 basis points,

57% less than what is charged by the R5 share class of the New Perspective Fund, and 46% less than what is charged by the R6 share class of the New Perspective Fund.

91.     While the performance of the Vanguard funds has been comparable to that of the New Perspective Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| The New Perspective Fund (R5) | 19.85% | 8.42% | 13.94% |
| The New Perspective Fund (R6) | 19.92% | 8.46% | 13.99% |
| Vanguard Global Minimum Volatility Fund | 14.54% | 10.77% | N/A |
| Vanguard Total World Stock Index Fund | 17.75% | 5.58% | 11.80% |

92.     The Committee could have selected and retained a mutual fund comparable to the New Perspective Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

93.     Moreover, as noted above, the Committee retained the more expensive R5 share class of the New Perspective Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### g.     The New World Fund

94.     The New World Fund is a mutual fund managed by CRMC.

26

95.     The New World Fund's investment strategy is to invest primarily in the common stocks of companies with significant exposure to countries with developing economies and/or markets.

96.     The New World Fund's objective is to provide investors with long-term capital appreciation.

97.     Prior to 2014, the Plan offered the R5 share class of the New World Fund (RNWFX), which charges an expense ratio of 71 basis points. In 2014, the Plan switched to the less expensive R6 share class of the New World Fund (RNWGX), which charges an expense ratio of 65 basis points.

98.     Although the R6 share class of the New World Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the New World Fund in the Plan until 2014.

99.     During the Relevant Period, the Plan has had between $119 million and $168 million of its assets invested in the New World Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $141 M |
| 2012 | $119 M |
| 2013 | $120 M |
| 2014 | $168 M |
| 2015 | $149 M |
| 2016 | $128 M |

100.    The fees charged to Plan participants and beneficiaries for these investments in the New World Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard International Explorer Fund (VINEX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 41 basis points, 42% less

than what is charged by the R5 share class of the New World Fund, and 36% less than what is charged by the R6 share class of the New World Fund. The Vanguard Developed Markets Index Fund (VTMGX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 90% less than what is charged by the R5 share class of the New World Fund, and 89% less than what is charged by the R6 share class of the New World Fund.

101.   While the performance of the Vanguard funds has been comparable to that of the New World Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| The New World Fund (R5) | 20.01% | 2.10% | 7.58% |
| The New World Fund (R6) | 20.08% | 2.15% | 7.63% |
| Vanguard International Explorer Fund | 18.98% | 5.91% | 13.79% |
| Vanguard Developed Markets Index Fund | 16.94% | 2.01% | 10.50% |

102.   The Committee could have selected and retained a mutual fund comparable to the New World Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

103.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the New World Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a

higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### h.    SMALLCAP World Fund

104.   The SMALLCAP World Fund is a mutual fund managed by CRMC.

105.   The SMALLCAP World Fund's investment strategy is to invest at least 80% of its net assets in growth-oriented common stocks and other equity-type securities (such as preferred stocks, convertible preferred stocks, and convertible bonds) of companies with small market capitalizations.

106.   The SMALLCAP World Fund's objective is to provide investors with long-term growth of capital.

107.   Prior to 2014, the Plan offered the R5 share class of the SMALLCAP World Fund (RSLFX), which charges an expense ratio of 77 basis points. In 2014, the Plan switched to the less expensive R6 share class of the SMALLCAP World Fund (RLLGX), which charges an expense ratio of 71 basis points.

108.   Although the R6 share class of the SMALLCAP World Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the SMALLCAP World Fund in the Plan until 2014.

109.   During the Relevant Period, the Plan has had between $84 million and $140 million of its assets invested in the SMALLCAP World Fund, as follows:

| Plan Year | Plan Assets |
|---|---|
| 2011 | $98 M |
| 2012 | $84 M |
| 2013 | $99 M |
| 2014 | $152 M |
| 2015 | $161 M |
| 2016 | $140 M |

110.   The fees charged to Plan participants and beneficiaries for these investments in the SMALLCAP World Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Global Minimum Volatility Fund (VMNVX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 77% less than what is charged by the R5 share class of the SMALLCAP World Fund, and 76% less than what is charged by the R6 share class of the SMALLCAP World Fund. The Vanguard Total World Stock Index Fund (VTWSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 21 basis points, 72% less than what is charged by the R5 share class of the SMALLCAP World Fund, and 70% less than what is charged by the R6 share class of the SMALLCAP World Fund.

111.   While the performance of the Vanguard funds has been comparable to that of the SMALLCAP World Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

30

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| SMALLCAP World Fund (R5) | 19.47% | 7.87% | 13.18% |
| SMALLCAP World Fund (R6) | 19.55% | 7.92% | 13.23% |
| Vanguard Global Minimum Volatility Fund | 14.54% | 10.77% | N/A |
| Vanguard Total World Stock Index Fund | 17.75% | 5.58% | 11.80% |

112.    The Committee could have selected and retained a mutual fund comparable to the SMALLCAP World Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

113.    Moreover, as noted above, the Committee retained the more expensive R5 share class of the SMALLCAP World Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### i.    American Funds Developing World Growth and Income Fund

114.    The American Funds Developing World Growth and Income Fund is a mutual fund managed by CRMC.

115.    The American Funds Developing World Growth and Income Fund's investment strategy is to invest at least 80% of its assets in securities that are issued by companies in developing countries, principally traded in the securities market of developing countries, denominated in developing country currencies, or issued by companies deemed to be suitable for investment because they have significant economic exposure to developing countries.

116.   The American Funds Developing World Growth and Income Developing World Growth and Income Fund's objective is to provide investors with long-term growth of capital and current income.

117.   In late 2014 or early 2015, the American Funds Developing World Growth and Income Fund was added as a Plan investment option. The Plan offers the R6 share class of the American Funds Developing World Growth and Income Fund (RDWGX), which charges an expense ratio of 92 basis points.

118.   During the Relevant Period, the Plan has had between $1.4 million and $6.6 million of its assets invested in the American Funds Developing World Growth and Income Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2015 | $1.4 M |
| 2016 | $6.6 M |

119.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds Developing World Growth and Income Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard International Value Fund (VTRIX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 43 basis points, more than 53% less than what is charged by the R6 share class of the American Funds Developing World Growth and Income Fund. The Vanguard International Dividend Appreciation Index Fund (VIAAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 25 basis points, more than 72% less than what is charged by the R6 share class of the American Funds Developing World Growth and Income Fund.

32

120.   While the performance of the Vanguard funds has been comparable to that of the American Funds Developing World Growth and Income Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds Developing World Growth and Income Fund (R5) | 19.60% | -0.68% | N/A |
| American Funds Developing World Growth and Income Fund (R6) | 19.67% | -0.63% | N/A |
| Vanguard International Value Fund | 19.45% | 0.46% | 9.54% |
| Vanguard International High Dividend Appreciation Index Fund | 13.75% | N/A | N/A |

121.   The Committee could have selected and retained a mutual fund comparable to the American Funds Developing World Growth and Income Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

### j.   American Mutual Fund

122.   The American Mutual Fund is a mutual fund managed by CRMC.

123.   The American Mutual Fund's investment strategy is to invest primarily in the common stocks of companies that are likely to participate in the growth of the American economy and whose dividends appear to be sustainable.

124.   The American Mutual Fund's objective is to provide investors with current income, growth of capital, and conservation of principal.

125.   Prior to 2014, the Plan offered the R5 share class of the American Mutual Fund (RMFFX), which charges an expense ratio of 36 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Mutual Fund (RMFGX), which charges an expense ratio of 30 basis points.

126.   Although the R6 share class of the American Mutual Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the American Mutual Fund in the Plan until 2014.

127.   During the Relevant Period, the Plan has had between $22 million and $65 million of its assets invested in the American Mutual Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $22 M |
| 2012 | $25 M |
| 2013 | $34 M |
| 2014 | $56 M |
| 2015 | $59 M |
| 2016 | $65 M |

128.   The fees charged to Plan participants and beneficiaries for these investments in the American Mutual Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard U.S. Value Fund (VUVLX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 23 basis points, 36% less than what is charged by the R5 share class of the American Mutual Fund, and 23% less than what is charged by the R6 share class of the American Mutual Fund. The Vanguard Large Cap Index Fund (VLCAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 6 basis points, 83% less than what is

charged by the R5 share class of the American Mutual Fund, and 80% less than what is charged by the R6 share class of the American Mutual Fund.

129.   While the performance of the Vanguard funds has been comparable to that of the American Mutual Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Mutual Fund (R5) | 14.17% | 8.40 % | 13.30% |
| American Mutual Fund (R6) | 14.26% | 8.46% | 13.36% |
| Vanguard U.S. Value Fund | 14.40% | 7.24% | 15.14% |
| Vanguard Large Cap Index Fund | 17.73% | 9.91% | 15.28% |

130.   The Committee could have selected and retained a mutual fund comparable to the American Mutual Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

131.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Mutual Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### k.     Capital World Growth and Income Fund

132.    The Capital World Growth and Income Fund is a mutual fund managed by CRMC.

133.    The Capital World Growth and Income Fund's investment strategy is to invest primarily in the common stocks of well-established companies located around the world, many of which have the potential to pay dividends.

134.    The Capital World Growth and Income Fund's objective is to provide investors with long-term growth of capital and current income.

135.    Prior to 2014, the Plan offered the R5 share class of the Capital World Growth and Income Fund (RWIFX), which charges an expense ratio of 50 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Capital World Growth and Income Fund (RWIGX), which charges an expense ratio of 44 basis points.

136.    Although the R6 share class of the Capital World Growth and Income Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Capital World Growth and Income Fund in the Plan until 2014.

137.    During the Relevant Period, the Plan has had between $83 million and $162 million of its assets invested in the Capital World Growth and Income Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $119 M |
| 2012 | $105 M |
| 2013 | $115 M |
| 2014 | $173 M |
| 2015 | $168 M |
| 2016 | $152 M |

138.   The fees charged to Plan participants and beneficiaries for these investments in the Capital World Growth and Income Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Global Minimum Volatility Fund (VMNVX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 66% less than what is charged by the R5 share class of the Capital World Growth and Income Fund, and 61% less than what is charged by the R6 share class of the Capital World Growth and Income Fund. The Vanguard Total World Stock Index Fund (VTWSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 21 basis points, 57% less than what is charged by the R5 share class of the Capital World Growth and Income Fund, and 52% less than what is charged by the R6 share class of the Capital World Growth and Income Fund.

139.   While the performance of the Vanguard funds has been comparable to that of the Capital World Growth and Income Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Capital World Growth and Income Fund (R5) | 17.48% | 5.18% | 12.50% |
| Capital World Growth and Income Fund (R6) | 17.57% | 5.24% | 12.56% |
| Vanguard Global Minimum Volatility Fund | 14.54% | 10.77% | N/A |
| Vanguard Total World Stock Index Fund | 17.75% | 5.58% | 11.80% |

140.   The Committee could have selected and retained a mutual fund comparable to the Capital World Growth and Income Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but

it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

141.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Capital World Growth and Income Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### l.   Fundamental Investors

142.   Fundamental Investors is a mutual fund managed by CRMC.

143.   Fundamental Investors' investment strategy is to invest primarily in the common stocks of companies that appear to offer strong opportunities for capital growth, and most of which have a history of paying dividends.

144.   The Fundamental Investors' objective is to provide investors with long-term growth of capital and income.

145.   Prior to 2014, the Plan offered the R5 share class of Fundamental Investors (RFNFX), which charges an expense ratio of 35 basis points. In 2014, the Plan switched to the less expensive R6 share class of Fundamental Investors (RFNGX), which charges an expense ratio of 31 basis points.

146.   Although the R6 share class of Fundamental Investors was launched on May 1, 2009, the Committee retained the more expensive R5 share class of Fundamental Investors in the Plan until 2014.

38

147.   During the Relevant Period, the Plan has had between $83 million and $162 million of its assets invested in Fundamental Investors, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $86 M |
| 2012 | $83 M |
| 2013 | $100 M |
| 2014 | $154 M |
| 2015 | $159 M |
| 2016 | $162 M |

148.   The fees charged to Plan participants and beneficiaries for these investments in Fundamental Investors were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Growth and Income Fund (VGIAX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 23 basis points, 34% less than what is charged by the R5 share class of Fundamental Investors, and 25% less than what is charged by the R6 share class of Fundamental Investors. The Vanguard Tax-Managed Capital Appreciation Fund (VTCLX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 9 basis points, 74% less than what is charged by the R5 share class of Fundamental Investors, and 70% less than what is charged by the R6 share class of Fundamental Investors.

149.   While the performance of the Vanguard funds has been comparable to that of Fundamental Investors, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Fundamental Investors (R5) | 20.05% | 10.85% | 16.08% |
| Fundamental Investors (R6) | 20.11% | 10.91% | 16.14% |
| Vanguard Growth and Income Fund | 16.53% | 10.12% | 15.59% |
| Vanguard Tax-Managed Capital Appreciation Fund | 17.89% | 9.98% | 15.59% |

150.   The Committee could have selected and retained a mutual fund comparable to Fundamental Investors for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

151.   Moreover, as noted above, the Committee retained the more expensive R5 share class of Fundamental Investors for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### m.   International Growth and Income Fund

152.   The International Growth and Income Fund is a mutual fund managed by CRMC.

153.   The International Growth and Income Fund's investment strategy is to invest primarily in the stocks of larger, well-established companies domiciled outside the U.S., including in emerging markets and developing countries, that have the potential for growth and/or to pay dividends.

154.   The International Growth and Income Fund's objective is to provide investors with long-term growth of capital and current income.

40

155.    Prior to 2014, the Plan offered the R5 share class of the International Growth and Income Fund (RIGFX), which charges an expense ratio of 63 basis points. In 2014, the Plan switched to the less expensive R6 share class of the International Growth and Income Fund (RIGGX), which charges an expense ratio of 58 basis points.

156.    Although the R6 share class of the International Growth and Income Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the International Growth and Income Fund in the Plan until 2014.

157.    During the Relevant Period, the Plan had between $19 million and $37 million of its assets invested in the International Growth and Income Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $19 M |
| 2012 | $19 M |
| 2013 | $23 M |
| 2014 | $37 M |
| 2015 | $37 M |
| 2016 | $31 M |

158.    The fees charged to Plan participants and beneficiaries for these investments in the International Growth and Income Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard International Growth Fund (VWILX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 33 basis points, 47% less than what is charged by the R5 share class of the International Growth and Income Fund, and 43% less than what is charged by the R6 share class of the International Growth and Income Fund. The Vanguard FTSE All-World ex-US Index Fund (VFWAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 11 basis points, 82% less than what is charged by the R5 share class of

41

the International Growth and Income Fund, and 81% less than what is charged by the R6 share class of the International Growth and Income Fund.

159.   While the performance of the Vanguard funds has been comparable to that of the International Growth and Income Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| International Growth and Income Fund (R5) | 15.18% | -0.61% | 8.54% |
| International Growth and Income Fund (R6) | 15.25% | -0.57% | 8.59% |
| Vanguard International Growth Fund | 25.97% | 5.32% | 11.81% |
| Vanguard FTSE All-World ex-US Index Fund | 18.68% | 1.77% | 8.76% |

160.   The Committee could have selected and retained a mutual fund comparable to the International Growth and Income Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but they chose not to do so because of their conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

161.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the International Growth and Income Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

42

### n.    The Investment Company of America

162.    The Investment Company of America is a mutual fund and managed by CRMC.

163.    The Investment Company of America's investment strategy is to invest primarily in the common stocks, most of which have a history of paying dividends.

164.    The Investment Company of America's objective is to provide investors with long-term growth of capital and income.

165.    Prior to 2014, the Plan offered the R5 share class of the Investment Company of America (RICFX), which charges an expense ratio of 35 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Investment Company of America (RICGX), which charges an expense ratio of 30 basis points.

166.    Although the R6 share class of the Investment Company of America was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Investment Company of America in the Plan until 2014.

167.    During the Relevant Period, the Plan has had between $47 million and $98 million of its assets invested in the Investment Company of America, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $47 M |
| 2012 | $48 M |
| 2013 | $51 M |
| 2014 | $89 M |
| 2015 | $93 M |
| 2016 | $98 M |

168.    The fees charged to Plan participants and beneficiaries for these investments in the Investment Company of America were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the

43

Vanguard Windsor Fund (VWNEX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 20 basis points, 42% less than what is charged by the R5 share class of the Investment Company of America, and 33% less than what is charged by the R6 share class of the Investment Company of America. The Vanguard Total Stock Market Index Fund (VTSAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 4 basis points, 88% less than what is charged by the R5 share class of the Investment Company of America, and 86% less than what is charged by the R6 share class of the Investment Company of America.

169.   While the performance of the Vanguard funds has been comparable to that of the Investment Company of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| The Investment Company of America (R5) | 16.74% | 8.89% | 15.21% |
| The Investment Company of America (R6) | 16.81% | 8.94% | 15.26% |
| Vanguard Windsor Fund | 18.47% | 7.23% | 15.46% |
| Vanguard Total Stock Market Index Fund | 17.67% | 9.64% | 15.22% |

170.   The Committee could have selected and retained a mutual fund comparable to the Investment Company of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

171.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Investment Company of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### o.   Washington Mutual Investors Fund

172.   The Washington Mutual Investors Fund is a mutual fund managed by CRMC.

173.   The Washington Mutual Investors Fund's investment strategy is to invest primarily in the common stocks of established companies that are listed on, or meet the financial listing requirements of, the New York Stock Exchange and have a strong record of earnings and dividends.

174.   The Washington Mutual Investors Fund's objective is to provide investors with income and opportunity for growth of principal consistent with sound common stock investing.

175.   Prior to 2014, the Plan offered the R5 share class of the Washington Mutual Investors Fund (RWMFX), which charges an expense ratio of 35 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Washington Mutual Investors Fund (RWMGX), which charges an expense ratio of 30 basis points.

176.   Although the R6 share class of the Washington Mutual Investors Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Washington Mutual Investors Fund in the Plan until 2014.

177.   During the Relevant Period, the Plan has had between $84 million and $133 million of its assets invested in the Washington Mutual Investors Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $62 M |
| 2012 | $71 M |
| 2013 | $85 M |
| 2014 | $128 M |
| 2015 | $128 M |
| 2016 | $131 M |

178.   The fees charged to Plan participants and beneficiaries for these investments in the Washington Mutual Investors Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Equity Income Fund (VEIRX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 51% less than what is charged by the R5 share class of the Washington Mutual Investors Fund, and 43% less than what is charged by the R6 share class of the Washington Mutual Investors Fund. The Vanguard Value Index Fund (VVIAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 6 basis points, 82% less than what is charged by the R5 share class of the Washington Mutual Investors Fund, and 80% less than what is charged by the R6 share class of the Washington Mutual Investors Fund.

179.   While the performance of the Vanguard funds has been comparable to that of the Washington Mutual Investors Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| Washington Mutual Investors Fund (R5) | 16.87% | 8.91% | 14.55% |

| Washington Mutual Investors Fund (R6) | 16.92% | 8.97% | 14.61% |
|---|---|---|---|
| Vanguard Equity Income Fund | 14.60% | 8.93% | 14.50% |
| Vanguard Value Index Fund | 15.75% | 8.81% | 15.05% |

180.   The Committee could have selected and retained a mutual fund comparable to the Washington Mutual Investors Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

181.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Washington Mutual Investors Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### p.   Capital Income Builder

182.   The Capital Income Builder is a mutual fund managed by CRMC.

183.   The Capital Income Builder's investment strategy is to invest primarily in a broad range of income-producing securities, including common stocks and bonds.

184.   The Capital Income Builder objective is to provide investors with a level of current income that exceeds the average yield of U.S. stocks generally and a growing stream of income over the years, with a secondary objective being the growth of capital.

185.   Prior to 2014, the Plan offered the R5 share class of the Capital Income Builder (RIRFX), which charges an expense ratio of 37 basis points. In 2014, the Plan

47

switched to the less expensive R6 share class of the Capital Income Builder (RIRGX), which charges an expense ratio of 30 basis points.

186.   Although the R6 share class of the Capital Income Builder was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Capital Income Builder in the Plan until 2014.

187.   During the Relevant Period, the Plan has had between $84 million and $135 million of its assets invested in the Capital Income Builder, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $84 M |
| 2012 | $89 M |
| 2013 | $97 M |
| 2014 | $135 M |
| 2015 | $131 M |
| 2016 | $133 M |

188.   The fees charged to Plan participants and beneficiaries for these investments in Capital Income Builder were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Global Minimum Volatility Fund (VMNVX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 17 basis points, 54% less than what is charged by the R5 share class of the Capital Income Builder, and 43% less than what is charged by the R6 share class of the Capital Income Builder. The Vanguard Total World Stock Index Fund (VTWSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 21 basis points, 43% less than what is charged by the R5 share class of the Capital Income Builder, and 30% less than what is charged by the R6 share class of the Capital Income Builder.

189.   While the performance of the Vanguard funds has been comparable to that of the Capital Income Builder, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Capital Income Builder (R5) | 10.34% | 4.41% | 8.88% |
| Capital Income Builder (R6) | 10.40% | 4.46% | 8.94% |
| Vanguard Global Minimum Volatility Fund | 14.54% | 10.77% | N/A |
| Vanguard Total World Stock Index Fund | 17.75% | 5.58% | 11.80% |

190.   The Committee could have selected and retained a mutual fund comparable to the Capital Income Builder for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

191.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Capital Income Builder for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

q.      **The Income Fund of America**

192.   The Income Fund of America is a mutual fund managed by CRMC.

193.   The Income Fund of America's investment strategy is to invest primarily in income-producing securities.

49

194.   The Income Fund of America's objective is to provide investors with current income while secondarily striving for capital growth.

195.   Prior to 2014, the Plan offered the R5 share class of the Income Fund of America (RIDFX), which charges an expense ratio of 33 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Income Fund of America (RIDGX), which charges an expense ratio of 28 basis points.

196.   Although the R6 share class of the Income Fund of America was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Income Fund of America in the Plan until 2014.

197.   During the Relevant Period, the Plan has had between $27 million and $55 million of its assets invested in the Income Fund of America, as follows:

| Plan Year | Plan Assets |
| --- | --- |
| 2011 | $27 M |
| 2012 | $29 M |
| 2013 | $34 M |
| 2014 | $52 M |
| 2015 | $54 M |
| 2016 | $55 M |

198.   The fees charged to Plan participants and beneficiaries for these investments in Income Fund of America were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Wellington Fund (VWENX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 16 basis points, 51% less than what is charged by the R5 share class of the Income Fund of America, and 42% less than what is charged by the R6 share class of the Income Fund of America. The Vanguard Balanced Index Fund (VBIAX)—a passively managed mutual fund with a similar investment

50

strategy and objective—charges an expense ratio of 7 basis points, 78% less than what is charged by the R5 share class of the Income Fund of America, and 75% less than what is charged by the R6 share class of the Income Fund of America.

199.   While the performance of the Vanguard funds has been comparable to that of the Income Fund of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| The Income Fund of America (R5) | 12.03% | 5.87% | 10.47% |
| The Income Fund of America (R6) | 12.08% | 5.92% | 10.53% |
| Vanguard Wellington Fund | 12.42% | 7.09% | 11.01% |
| Vanguard Balanced Index Fund | 11.00% | 6.88% | 9.96% |

200.   The Committee could have selected and retained a mutual fund comparable to the Income Fund of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

201.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Income Fund of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### r.    American Balanced Fund

202.   The American Balanced Fund is a mutual fund managed by CRMC.

203.   The American Balanced Fund's investment strategy is to invest in a broad range of securities, including common stocks and investment-grade bonds.

204.   The American Balanced Fund's objective is to provide investors with conservation of capital, current income, and long-term growth of capital and income.

205.   Prior to 2014, the Plan offered the R5 share class of the American Balanced Fund (RLBFX), which charges an expense ratio of 34 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Balanced Fund (RLBGX), which charges an expense ratio of 29 basis points.

206.   Although the R6 share class of the American Balanced Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the American Balanced Fund in the Plan until 2014.

207.   During the Relevant Period, the Plan has had between $29 million and $72 million of its assets invested in the American Balanced Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $29 M |
| 2012 | $29 M |
| 2013 | $37 M |
| 2014 | $61 M |
| 2015 | $62 M |
| 2016 | $72 M |

208.   The fees charged to Plan participants and beneficiaries for these investments in American Balanced Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Wellington Fund (VWENX)—an actively managed mutual fund with a similar investment

52

strategy and objective—charges an expense ratio of 16 basis points, 56% less than what is charged by the R5 share class of the American Balanced Fund, and 44% less than what is charged by the R6 share class of the American Balanced Fund. The Vanguard Balanced Index Fund (VBIAX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 79% less than what is charged by the R5 share class of the American Balanced Fund, and 75% less than what is charged by the R6 share class of the American Balanced Fund.

209.   While the performance of the Vanguard funds has been comparable to that of the American Balanced Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Balanced Fund (R5) | 12.24% | 7.62% | 11.67% |
| American Balanced Fund (R6) | 12.31% | 7.69% | 11.72% |
| Vanguard Wellington Fund | 12.42% | 7.09% | 11.01% |
| Vanguard Balanced Index Fund | 11.00% | 6.88% | 9.96% |

210.   The Committee could have selected and retained a mutual fund comparable to the American Balanced Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

211.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Balanced Fund for several years despite the availability of the

less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

      **s.**    **American Funds Global Balanced Fund**

212.   The American Funds Global Balanced Fund is a mutual fund managed by CRMC.

213.   The American Funds Global Balanced Fund's investment strategy is to invest in the equity and debt securities around the world that offer the opportunity for growth and/or provide dividend income, while also constructing the portfolio to protect principal and limit volatility.

214.   The American Funds Global Balanced Fund's objective is to provide investors with long-term growth of capital, conservation of principal, and current income.

215.   Prior to 2014, the Plan offered the R5 share class of the American Funds Global Balanced Fund (RGBFX), which charges an expense ratio of 60 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Global Balanced Fund (RGBGX), which charges an expense ratio of 54 basis points.

216.   Although the R6 share class of the American Funds Global Balanced Fund was launched on February 1, 2011, the Committee retained the more expensive R5 share class of the American Funds Global Balanced Fund in the Plan until 2014.

217.   During the Relevant Period, the Plan has had between $7.8 million and $21 million of its assets invested in the American Funds Global Balanced Fund, as follows:

| Plan Year | Plan Assets |
|---|---|
| 2011 | $7.8 M |
| 2012 | $12 M |

| 2013 | $14 M |
|------|-------|
| 2014 | $21 M |
| 2015 | $18 M |
| 2016 | $17 M |

218.   Fees charged to Plan participants and beneficiaries for these investments in American Funds Global Balanced Fund were and continue to be well in excess of fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Wellington Fund (VWENX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 16 basis points, 73% less than what is charged by the R5 share class of the American Funds Global Balanced Fund, and 70% less than what is charged by the R6 share class of the American Funds Global Balanced Fund. The Vanguard Tax-Managed Balanced Fund (VTMFX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 11 basis points, 81% less than what is charged by the R5 share class of the American Funds Global Balanced Fund, and 79% less than what is charged by the R6 share class of the American Funds Global Balanced Fund.

219.   While the performance of the Vanguard funds has been comparable to that of the American Funds Global Balanced Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds Global Balanced Fund (R5) | 9.51% | 3.09% | 8.45% |
| American Funds Global Balanced Fund (R6) | 9.57% | 3.14% | 8.51% |
| Vanguard Wellington Fund | 12.42% | 7.09% | 11.01% |
| Vanguard Tax-Managed Balanced Fund | 8.95% | 6.35% | 8.91% |

220.   The Committee could have selected and retained a mutual fund comparable to the American Funds Global Balanced Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

221.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Global Balanced Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### t.   American Funds Mortgage Fund

222.   The American Funds Mortgage Fund is a mutual fund managed by CRMC. The American Funds Mortgage Fund's investment strategy is to invest primarily in the mortgage-related securities that are sponsored or guaranteed by the U.S. government. The objective of the American Funds Mortgage Fund is to provide investors with current income and preservation of capital.

223.   Prior to 2014, the Plan offered the R5 share class of the American Funds Mortgage Fund (RMAFX), which charges an expense ratio of 39 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Mortgage Fund (RMAGX), which charges an expense ratio of 32 basis points.

56

224.   Although the R6 share class of the American Funds Mortgage Fund was launched on November 1, 2010, the Committee retained the more expensive R5 share class of the American Funds Mortgage Fund in the Plan until 2014.

225.   During the Relevant Period, the Plan had between $337,000 and $6.4 million of its assets invested in the American Funds Mortgage Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $337,000 |
| 2012 | $5.7 M |
| 2013 | $4.2 M |
| 2014 | $4.3 M |
| 2015 | $4.4 M |
| 2016 | $6.4 M |

226.   Fees charged to Plan participants and beneficiaries for these investments in the American Funds Mortgage Fund were and continue to be well in excess of fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard GNMA Fund (VFIJX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 11 basis points, 71% less than what is charged by the R5 share class of the American Funds Mortgage Fund, and 65% less than what is charged by the R6 share class of the American Funds Mortgage Fund. The Vanguard Mortgage-Backed Securities Index Fund (VMBSX)—a passively managed mutual fund with a similar investment and strategy—charges an expense ratio of 7 basis points, 82% less than what is charged by the R5 share class of the American Funds Mortgage Fund, and 78% less than what is charged by the R6 share class of the American Funds Mortgage Fund.

227.   While the performance of the Vanguard funds has been comparable to that of the American Funds Mortgage Fund, as illustrated by a comparison of their average month-

end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds Mortgage Fund (R5 Share Class) | 2.14% | 2.58% | 2.20% |
| American Funds Mortgage Fund (R6 Share Class) | 2.22% | 2.66% | 2.27% |
| Vanguard GNMA Fund | 1.17% | 2.51% | 2.06% |
| Vanguard Mortgage-Backed Securities Index Fund | 1.07% | 2.24% | 2.00% |

228.   Further, the American Funds Mortgage Fund's prospectus lists the expense ratio of the R6 share class as 31 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (32 basis points) for investments in the R6 share class of the American Funds Mortgage Fund than if they invested in it outside of the Plan.

229.   The Committee could have selected and retained a mutual fund comparable to the American Funds Mortgage Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

230.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Mortgage Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

231.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead

58

of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (32 basis points) for the R6 share class of the American Funds Mortgage Fund than what is listed in the prospectus (31 basis points).

u.   **American High-Income Trust**

232.   The American High-Income Trust is a mutual fund managed by CRMC.

233.   The American High-Income Trust's investment strategy is to invest primarily in higher yielding and generally lower quality debt securities (*i.e.*, "junk bonds").

234.   The American High-Income Trust's objective is to provide investors with a high level of current income and capital appreciation.

235.   Prior to 2014, the Plan offered the R5 share class of the American High-Income Trust (RITFX), which charges an expense ratio of 42 basis points. In 2014, the Plan switched to the less expense R6 share class of the American High-Income Trust (RITGX), which charges an expense ratio of 34 basis points.

236.   Although the R6 share class of the American High-Income Trust was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the American High-Income Trust in the Plan until 2014.

237.   During the Relevant Period, the Plan has had between $63 million and $87 million of its assets invested in the American High-Income Trust, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $63 M |
| 2012 | $67 M |
| 2013 | $67 M |
| 2014 | $87 M |
| 2015 | $76 M |
| 2016 | $74 M |

59

238.   The fees charged to Plan participants and beneficiaries for these investments in American High-Income Trust were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard High-Yield Corporate Fund (VWEAX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 13 basis points, 69% less than what is charged by the R5 share class of the American High-Income Trust and 61% less than what is charged by the R6 share class of the American High-Income Trust. The Vanguard Long-Term Corporate Bond Index Fund (VLTCX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 83% less than what is charged by the R5 share class of the American High-Income Trust and 79% less than what is charged by the R6 share class of the American High-Income Trust.

239.   While the performance of the Vanguard funds has been comparable to that of the American High-Income Trust, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American High-Income Trust (R5) | 13.16% | 3.09% | 6.00% |
| American High-Income Trust (R6) | 13.22% | 3.14% | 6.06% |
| Vanguard High-Yield Corporate Fund | 10.91% | 4.83% | 6.65% |
| Vanguard Long-Term Corporate Bond Index Fund | 5.39% | 4.86% | 5.22% |

240.   The Committee could have selected and retained a mutual fund comparable to the American High-Income Trust for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose

not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

241.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American High-Income Trust for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### v.   The Bond Fund of America

242.   The Bond Fund of America is a mutual fund managed by CRMC.

243.   The Bond Fund of America's investment strategy is to invest a majority of its assets in debt securities rated A3 or better or A- or better by Nationally Recognized Statistical Ratings Organizations, or in debt securities unrated but determined to be of equivalent quality.

244.   The Bond Fund of America's objective is to provide investors with as high a level of current income as is consistent with the preservation of capital.

245.   Prior to 2014, the Plan offered the R5 share class of the Bond Fund of America (RBFFX), which charges an expense ratio of 31 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Bond Fund of America (RBFGX), which charges an expense ratio of 26 basis points.

246.   Although the R6 share class of the Bond Fund of America was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Bond Fund of America in the Plan until 2014.

247.   During the Relevant Period, the Plan has had between $26 million and $41 million of its assets invested in the Bond Fund of America, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $26 M |
| 2012 | $31 M |
| 2013 | $32 M |
| 2014 | $33 M |
| 2015 | $34 M |
| 2016 | $41 M |

248.   The fees charged to Plan participants and beneficiaries for these investments in Bond Fund of America were and continue to be well in excess of fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Core Bond Fund (VCOBX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 15 basis points, 51% less than what is charged by the R5 share class of the Bond Fund of America, and 42% less than what is charged by the R6 share class of the Bond Fund of America. The Vanguard Long-Term Corporate Bond Index Fund (VLTCX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 77% less than what is charged by the R5 share class of the Bond Fund of America, and 73% less than what is charged by the R6 share class of the Bond Fund of America.

249.   While the performance of the Vanguard funds has been comparable to that of the Bond Fund of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| The Bond Fund of America (R5 Share Class) | 2.49% | 2.64% | 2.64% |
| The Bond Fund of America (R6 Share Class) | 2.55% | 2.69% | 2.69% |
| Vanguard Core Bond Fund | 2.08% | N/A | N/A |
| Vanguard Long-Term Corporate Bond Index Fund | 5.39% | 4.86% | 5.22% |

250. Further, the Bond Fund of America's prospectus lists the expense ratio of the R6 share class as 25 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (26 basis points) for investments in the R6 share class of the Bond Fund of America than if they invested in it outside of the Plan.

251. The Committee could have selected and retained a mutual fund comparable to the Bond Fund of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

252. Moreover, as noted above, the Committee retained the more expensive R5 share class of the Bond Fund of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

253. In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (26 basis points) for the R6 share class of the Bond Fund of America than what is listed in the prospectus (25 basis points).

### w.    Capital World Bond Fund

254.   The Capital World Bond Fund is a mutual fund managed by CRMC.

255.   The Capital World Bond Fund's investment strategy is to invest in primarily in the debt securities, including asset-backed and mortgage-backed securities and securities of governmental, supranational, and corporate issuers denominated in various currencies.

256.   The Capital World Bond Fund's objective is to provide investors with a high level of total return consistent with prudent investment management.

257.   Prior to 2014, the Plan offered the R5 share class of the Capital World Bond Fund (RCWFX), which charges an expense ratio of 58 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Capital World Bond Fund (RCWGX), which charges an expense ratio of 53 basis points.

258.   Although the R6 share class of the Capital World Bond Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Capital World Bond Fund in the Plan until 2014.

259.   During the Relevant Period, the Plan has had between $25 million and $32 million of its assets invested in the Capital World Bond Fund, as follows:

| Plan Year | Plan Assets |
|:---:|:---:|
| 2011 | $28 M |
| 2012 | $31 M |
| 2013 | $28 M |
| 2014 | $32 M |
| 2015 | $26 M |
| 2016 | $25 M |

260.   The fees charged to Plan participants and beneficiaries for these investments in Capital World Bond Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard High-

Yield Corporate Fund (VWEAX)—an actively managed mutual fund with a similar investment strategy and objectives—charges an expense ratio of 13 basis points, 77% less than what is charged by the R5 share class of the Capital World Bond Fund, and 75% less than what is charged by the R6 share class of the Capital World Bond Fund. The Vanguard Total Bond Index Fund (VTABX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 12 basis points, 79% less than what is charged by the R5 share class of the Capital World Bond Fund, and 77% less than what is charged by the R6 share class of the Capital World Bond Fund.

261.   While the performance of the Vanguard funds has been comparable to that of the Capital World Bond Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Capital World Bond Fund (R5) | 2.91% | 0.29% | 1.67% |
| Capital World Bond Fund (R6) | 2.98% | 0.34% | 1.73% |
| Vanguard High-Yield Corporate Fund | 10.91% | 4.83% | 6.65% |
| Vanguard Total Bond Index Fund | 1.67% | 3.90% | N/A |

262.   The Committee could have selected and retained a mutual fund comparable to the Capital World Bond Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

263.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Capital World Bond Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

x.   **Intermediate Bond Fund of America**

264.   The Intermediate Bond Fund of America is a mutual fund managed by CRMC.

265.   The Intermediate Bond Fund of America's investment strategy is to invest primarily in bonds and other debt securities with quality ratings of A- or better or A3 or better by Nationally Recognized Statistical Ratings Organization, or in bonds and other debt securities that are unrated, but determined to be of equivalent quality.

266.   The Intermediate Bond Fund of America's objective is to provide investors with current income and preservation of capital.

267.   Prior to 2014, the Plan offered the R5 share class of the Intermediate Bond Fund of America (RBOFX), which charges an expense ratio of 32 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Intermediate Bond Fund of America (RBOGX), which charges an expense ratio of 27 basis points.

268.   Although the R6 share class of the Intermediate Bond Fund of America was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the Intermediate Bond Fund of America in the Plan until 2014.

269.   During the Relevant Period, the Plan has had between $13 million and $27 million of its assets invested in the Intermediate Bond Fund of America, as follows:

66

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $13 M |
| 2012 | $18 M |
| 2013 | $13 M |
| 2014 | $19 M |
| 2015 | $21 M |
| 2016 | $27 M |

270.    The fees charged to Plan participants and beneficiaries for these investments in Intermediate Bond Fund of America were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Intermediate-Term Investment-Grade Fund (VFIDX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 10 basis points, 68% less than what is charged by the R5 share class of the Intermediate Bond Fund of America, and 62% less than what is charged by the R6 share class of the Intermediate Bond Fund of America. The Vanguard Intermediate-Term Bond Index Fund (VBILX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 78% less than what is charged by the R5 share class of the Intermediate Bond Fund of America, and 74% less than what is charged by the R6 share class of the Intermediate Bond Fund of America.

271.    While the performance of the Vanguard funds has been comparable to that of the Intermediate Bond Fund of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| Intermediate Bond Fund of America (R5) | 1.27% | 1.43% | 1.33% |

| Intermediate Bond Fund of America (R6) | 1.33% | 1.48% | 1.38% |
| Vanguard Intermediate-Term Investment-Grade Fund | 2.83% | 3.34% | 3.60% |
| Vanguard Intermediate-Term Bond Index Fund | 1.77% | 3.08% | 2.73% |

272.   The Committee could have selected and retained a mutual fund comparable to the Intermediate Bond Fund of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

273.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Intermediate Bond Fund of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### y.   Short-Term Bond Fund of America

274.   The Short-Term Bond Fund of America is a mutual fund managed by CRMC.

275.   The Short-Term Bond Fund of America's investment strategy is to primarily invest in debt securities denominated in U.S. dollars, including securities issued and guaranteed by the U.S. government, securities of corporate issuers, mortgage-backed securities, and debt securities and mortgage-backed securities issued by government sponsored entities and federal agencies and instrumentalities that are not backed by the full faith and credit of the U.S. government.

276.   The Short-Term Bond Fund of America's objective is to provide investors with current income and preservation of capital.

277.   Prior to 2014, the Plan offered the R5 share class of the Short-Term Bond Fund of America (RAMFX), which charges an expense ratio of 41 basis points. In 2014, the Plan switched to the less expensive R6 share class of the Short-Term Bond Fund of America (RMMGX), which charges an expense ratio of 35 basis points.

278.   Although the R6 share class of the Short-Term Bond Fund of America was launched on May 7, 2009, the Committee retained the more expensive R5 share class of the Short-Term Bond Fund of America in the Plan until 2014.

279.   During the Relevant Period, the Plan has had between $6.5 million and $22 million of its assets invested in the Short-Term Bond Fund of America, as follows:

| Plan Year | Plan Assets |
|---|---|
| 2011 | $8.1 M |
| 2012 | $8 M |
| 2013 | $6.5 M |
| 2014 | $9.3 M |
| 2015 | $10 M |
| 2016 | $21 M |

280.   The fees charged to Plan participants and beneficiaries for these investments in Short-Term Bond Fund of America were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Short-Term Federal Fund (VSGDX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 10 basis points, 75% less than what is charged by the R5 share class of the Short-Term Bond Fund of America, and 71% less than what is charged by the R6 share class of the Short-Term Bond Fund of America. The Vanguard Short-Term Bond Index Fund (VBIRX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 82% less than what is charged by the R5 share class of the

69

Short-Term Bond Fund of America, and 80% less than what is charged by the R6 share class of the Short-Term Bond Fund of America.

281.   While the performance of the Vanguard funds has been comparable to that of the Short-Term Bond Fund of America, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Short-Term Bond Fund of America (R5) | 1.10% | 0.89% | 0.71% |
| Short-Term Bond Fund of America (R6) | 1.16% | 0.95% | 0.77% |
| Vanguard Short-Term Federal Fund | 0.83% | 1.07% | 0.93% |
| Vanguard Short-Term Bond Index Fund | 1.08% | 1.25% | 1.20% |

282.   The Committee could have selected and retained a mutual fund comparable to the Short-Term Bond Fund of America for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

283.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the Short-Term Bond Fund of America for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

z.   **U.S Government Securities Fund**

284.   The U.S. Government Securities Fund is a mutual fund managed by CRMC.

70

285. The U.S. Government Securities Fund's investment strategy is to invest primarily in securities that are guaranteed or sponsored by the U.S. government, its agencies, and its instrumentalities.

286. The U.S. Government Securities Fund's objective is to provide investors with a high level of current income and preservation of capital.

287. Prior to 2014, the Plan offered the R5 share class of the U.S. Government Securities Fund (RGVFX), which charges an expense ratio of 32 basis points. In 2014, the Plan switched to the less expensive R6 share class of the U.S. Government Securities Fund (RGVGX), which charges an expense ratio of 27 basis points.

288. Although the R6 share class of the U.S. Government Securities Fund was launched on May 1, 2009, the Committee retained the more expensive R5 share class of the U.S. Government Securities Fund in the Plan until 2014.

289. During the Relevant Period, the Plan has had between $11 million and $32 million of its assets invested in the U.S. Government Securities Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $11 M |
| 2012 | $16 M |
| 2013 | $11 M |
| 2014 | $12 M |
| 2015 | $16 M |
| 2016 | $32 M |

290. The fees charged to Plan participants and beneficiaries for these investments in U.S. Government Securities Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Long-Term Investment-Grade Fund (VWETX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 11 basis

71

points, 66% less than what is charged by the R5 share class of the U.S. Government Securities Fund, and 59% less than what is charged by the R6 share class of the U.S. Government Securities Fund. The Vanguard Long-Term Government Bond Index Fund (VLGSX)—a passively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 7 basis points, 78% less than what is charged by the R5 share class of the U.S. Government Securities Fund, and 74% less than what is charged by the R6 share class of the U.S. Government Securities Fund.

291.   While the performance of the Vanguard funds has been comparable to that of the U.S. Government Securities Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make them better investment options for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| U.S. Government Securities Fund (R5) | 0.92% | 2.11% | 1.58% |
| U.S. Government Securities Fund (R6) | 0.98% | 2.19% | 1.63% |
| Vanguard Long-Term Investment-Grade Fund | 4.08% | 5.74% | 5.42% |
| Vanguard Long-Term Government Bond Index Fund | -1.79% | 5.28% | 2.28% |

292.   The Committee could have selected and retained a mutual fund comparable to the U.S. Government Securities Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

293.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the U.S. Government Securities Fund for several years despite the availability

of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

## 2. Portfolio Series Funds

294.  The Portfolio Series funds are "fund of funds" mutual funds. "Fund of funds" mutual funds invest in other mutual funds and offer greater diversification and access to high-minimum mutual funds, but with an additional layer of investment management fees.

295.  During the Relevant Period, the Plan has offered six Portfolio Series funds.

### a. American Funds Global Growth Portfolio

296.  The American Funds Global Growth Portfolio is a mutual fund managed by CRMC.

297.  The American Funds Global Growth Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the growth and growth-and-income categories.

298.  The American Funds Global Growth Portfolio's objective is to provide investors with long-term growth of capital.

299.  Prior to 2014, the Plan offered the R5 share class of the American Funds Global Growth Portfolio (RGGFX), which charges an expense ratio of 58 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Global Growth Portfolio (RGGGX), which charges an expense ratio of 53 basis points.

300.  Although the R6 share class of the American Funds Global Growth Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Global Growth Portfolio in the Plan until 2014.

301.   During the Relevant Period, the Plan has had between $1.4 million and $27 million of its assets invested in the American Funds Global Growth Portfolio, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2012 | $1.4 M |
| 2013 | $12 M |
| 2014 | $22 M |
| 2015 | $27 M |
| 2016 | $25 M |

302.   Fees charged to Plan participants and beneficiaries for these investments in the American Funds Global Growth Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard LifeStrategy Growth Fund (VASGX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 15 basis points, 74% less than what is charged by the R5 share class of the American Funds Global Growth Portfolio, and 71% less than what is charged by the R6 share class of the American Funds Global Growth Portfolio.

303.   While the performance of the Vanguard fund has been comparable to that of the American Funds Global Growth Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds Global Growth Portfolio (R5) | 19.46% | 6.09% | 12.66% |
| American Funds Global Growth Portfolio (R6) | 19.47% | 6.14% | 12.69% |
| Vanguard LifeStrategy Growth Fund | 14.48% | 6.19% | 10.92% |

74

304.   Further, the American Funds Global Growth Portfolio's prospectus lists the expense ratio of the R6 share class as 52 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (53 basis points) for investments in the R6 share class of the American Funds Global Growth Portfolio than if they invested in it outside of the Plan.

305.   The Committee could have selected and retained a mutual fund comparable to the American Funds Global Growth Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

306.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Global Growth Portfolio for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

307.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (53 basis points) for the R6 share class of the American Funds Global Growth Portfolio than what is listed in the prospectus (52 basis points).

###### b.    American Funds Growth Portfolio

308.    The American Funds Growth Portfolio is a mutual fund managed by CRMC.

309.    The American Funds Growth Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the growth and growth-and-income categories.

310.    The American Funds Growth Portfolio's objective is to provide investors with long-term growth of capital.

311.    Prior to 2014, the Plan offered the R5 share class of the American Funds Growth Portfolio (RGWFX), which charges an expense ratio of 52 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Growth Portfolio (RGWGX), which charges an expense ratio of 46 basis points.

312.    Although the R6 share class of the American Funds Growth Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Growth Portfolio in the Plan until 2014.

313.    During the Relevant Period, the Plan has had between $1.2 million and $31 million of its assets invested in the American Funds Growth Portfolio, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2012 | $1.2 M |
| 2013 | $10 M |
| 2014 | $25 M |
| 2015 | $31 M |
| 2016 | $29 M |

314.    The fees charged to Plan participants and beneficiaries for these investments in the American Funds Growth Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the

76

Vanguard LifeStrategy STAR Fund (VGSTX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 32 basis points, 38% less than what is charged by the R5 share class of the American Funds Growth Portfolio, and 30% less than what is charged by the R6 share class of the American Funds Growth Portfolio.

315.  While the performance of the Vanguard fund has been comparable to that of the American Funds Growth Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds Growth Portfolio (R5) | 18.06% | 7.86% | 13.99% |
| American Funds Growth Portfolio (R6) | 18.06% | 7.90% | 14.02% |
| Vanguard STAR Fund | 13.01% | 5.96% | 9.99% |

316.  The Committee could have selected and retained a mutual fund comparable to the American Funds Growth Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

317.  Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Growth Portfolio for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and

77

beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### c.    American Funds Growth and Income Portfolio

318.    The American Funds Growth and Income Portfolio is a mutual fund managed by CRMC.

319.    The American Funds Growth and Income Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the growth, growth-and-income, equity-income, and balanced categories.

320.    The American Funds Growth and Income Portfolio's objective is to provide investors with long-term growth of capital and current income.

321.    Prior to 2014, the Plan offered the R5 share class of the American Funds Growth and Income Portfolio (RGNFX), which charges an expense ratio of 45 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Growth and Income Portfolio (RGNGX), which charges an expense ratio of 39 basis points.

322.    Although the R6 share class of the American Funds Growth and Income Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Growth and Income Portfolio in the Plan until 2014.

323.    During the Relevant Period, the Plan has had between $1.5 million and $24 million of its assets invested in the American Funds Growth and Income Portfolio, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2012 | $1.5 M |
| 2013 | $13 M |
| 2014 | $21 M |
| 2015 | $25 M |
| 2016 | $24 M |

78

324.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds Growth and Income Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard LifeStrategy Moderate Growth Fund (VSMGX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 14 basis points, 68% less than what is charged by the R5 share class of the American Funds Growth and Income Portfolio and 64% less than what is charged by the R6 share class of the American Funds Growth and Income Portfolio.

325.   While the performance of the Vanguard fund has been comparable to that of the American Funds Growth and Income Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds Growth and Income Portfolio (R5) | 13.98% | 6.18% | 11.29% |
| American Funds Growth and Income Portfolio (R6) | 13.96% | 6.23% | 11.32% |
| Vanguard LifeStrategy Moderate Growth Fund | 11.16% | 5.44% | 8.81% |

326.   The Committee could have selected and retained a mutual fund comparable to the American Funds Growth and Income Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

327.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Growth and Income Portfolio for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### d.   American Funds Balanced Portfolio

328.   The American Funds Balanced Portfolio is a mutual fund managed by CRMC.

329.   The American Funds Balanced Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the growth, growth-and-income, equity-income, balanced, and bond categories.

330.   The American Funds Balanced Portfolio's objective is to provide investors with current income and long-term growth of capital and income.

331.   Prior to 2014, the Plan offered the R5 share class of the American Funds Balanced Portfolio (RBAFX), which charges an expense ratio of 46 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Balanced Portfolio (RBAGX), which charges an expense ratio of 40 basis points.

332.   Although the R6 share class of the American Funds Balanced Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Balanced Portfolio in the Plan until 2014.

333.   During the Relevant Period, the Plan had between $1.5 million and $10 million of its assets invested in the American Funds Balanced Portfolio, as follows:

| Plan Year | Plan Assets |
|---|---|
| 2012 | $1.5 M |
| 2013 | $6.3 M |

| 2014 | $10 M |
|------|-------|
| 2015 | $10 M |
| 2016 | $10 M |

334.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds Balanced Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard LifeStrategy Conservative Growth Fund (VSCGX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 13 basis points, 71% less than what is charged by the R5 share class of the American Funds Balanced Portfolio, and 67% less than what is charged by the R6 share class of the American Funds Balanced Portfolio.

335.   While the performance of the Vanguard fund has been comparable to that of the American Funds Balanced Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds Balanced Portfolio (R5) | 12.11% | 6.11% | 10.23% |
| American Funds Balanced Portfolio (R6) | 12.17% | 6.16% | 10.26% |
| Vanguard LifeStrategy Conservative Growth Fund | 7.93% | 4.61% | 6.67% |

336.   The Committee could have selected and retained a mutual fund comparable to the American Funds Balanced Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested

81

decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

337.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Balanced Portfolio for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### e.   American Funds Income Portfolio

338.   The American Funds Income Portfolio is a mutual managed by CRMC.

339.   The American Funds Income Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the growth-and-income, equity-income, balanced, and bond categories.

340.   The American Funds Income Portfolio's objective is to provide investors with current income and long-term growth of capital.

341.   Prior to 2014, the Plan offered the R5 share class of the American Funds Income Portfolio (RINFX), which charges an expense ratio of 38 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Income Portfolio (RINGX), which charges an expense ratio of 33 basis points.

342.   Although the R6 share class of the American Funds Income Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Income Portfolio in the Plan until 2014.

343.   During the Relevant Period, the Plan has had between $270,000 and $8.7 million of its assets invested in the American Funds Income Portfolio, as follows:

82

| Plan Year | Plan Assets |
|-----------|-------------|
| 2012 | $270,000 |
| 2013 | $5.9 M |
| 2014 | $7.5 M |
| 2015 | $7.4 M |
| 2016 | $8.7 M |

344.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds Income Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard LifeStrategy Moderate Growth Fund (VSMGX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 14 basis points, 63% less than what is charged by the R5 share class of the American Funds Income Portfolio, and 57% less than what is charged by the R6 share class of the American Funds Income Portfolio.

345.   While the performance of the Vanguard fund has been comparable to that of the American Funds Income Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard funds provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds Income Portfolio (R5) | 10.53% | 5.07% | 8.19% |
| American Funds Income Portfolio (R6) | 10.50% | 5.11% | 8.21% |
| Vanguard LifeStrategy Moderate Growth Fund | 11.16% | 5.44% | 8.81% |

346.   The Committee could have selected and retained a mutual fund comparable to the American Funds Income Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it

chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

347.  Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds Income Portfolio for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### f.   American Funds Preservation Portfolio

348.  The American Funds Preservation Portfolio is a mutual fund managed by CRMC.

349.  The American Funds Preservation Portfolio's investment strategy is to invest in a mix of mutual funds issued by American Funds in different combinations and weightings in the bond categories.

350.  The American Funds Preservation Portfolio's objective is to provide investors with current income, consistent with preservation of capital.

351.  Prior to 2014, the Plan offered the R5 share class of the American Funds Preservation Portfolio (RPPFX), which charges an expense ratio of 40 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds Preservation Portfolio (RPPGX), which charges an expense ratio of 35 basis points.

352.  Although the R6 share class of the American Funds Preservation Portfolio was launched on May 18, 2012, the Committee retained the more expensive R5 share class of the American Funds Preservation Portfolio in the Plan until 2014.

84

353.   During the Relevant Period, the Plan has had between $833,000 and $8.1 million of its assets invested in the American Funds Preservation Portfolio, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2012 | $833,000 |
| 2013 | $3.5 M |
| 2014 | $4.6 M |
| 2015 | $6.4 M |
| 2016 | $8.1 M |

354.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds Preservation Portfolio were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard LifeStrategy Income Fund (VASIX)—a "fund of funds" mutual fund with a similar investment strategy and objective—charges an expense ratio of 12 basis points, 70% less than what is charged by the R5 share class of the American Funds Preservation Portfolio, and 65% less than what is charged by the R6 share class of the American Funds Preservation Portfolio.

355.   While the performance of the Vanguard fund has been comparable to that of the American Funds Preservation Portfolio, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds Preservation Portfolio (R5) | 1.27% | 1.34% | 1.25% |
| American Funds Preservation Portfolio (R6) | 1.22% | 1.40% | 1.28% |
| Vanguard LifeStrategy Income Fund | 4.66% | 3.71% | 4.49% |

356.  Further, the American Funds Preservation Portfolio's prospectus lists the expense ratio of the R6 share class as 34 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (35 basis points) for investments in the R6 share class of the American Funds Preservation Portfolio than if they invested in it outside of the Plan.

357.  The Committee could have selected and retained a mutual fund comparable to the American Funds Preservation Portfolio for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

358.  Moreover, as noted above, the Committee retained the more expensive R5 share class of the AMCAP Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

359.  In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (35 basis points) for the R6 share class of the American Funds Preservation Portfolio than what is listed in the prospectus (34 basis points).

### 3.  <u>Target Date Funds</u>

360.   The Target Date funds offer Plan participants built-in diversification in a single mutual fund. Each Target Date fund has a date in its name that corresponds to an expected "target" year—the date when employees expect to start withdrawing money from their retirement account. The "target" year typically corresponds to the date of the employee's retirement.

361.   The Target Date funds are diversified across a broad range of asset classes and are automatically rebalanced based on the time until the "target" year. The Target Date funds with "target" years furthers in the future have the most aggressive investment mix (*i.e.*, they have a greater percentage invested in stocks and smaller investments in bonds and cash alternatives). As the "target" year approaches, target date funds gradually become more conservative (*i.e.*, they have a greater percentage invested in bonds and cash alternatives and smaller investments in stocks).

362.   During the Relevant Period, the Plan has offered between 10 and 11 Target Date funds.

#### a.      **American Funds 2010 Target Date Retirement Fund**

363.   The American Funds 2010 Target Date Retirement Fund is a mutual fund managed by CRMC.

364.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2010 Target Date Retirement Fund (REATX), which charges an expense ratio of 41 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2010 Target Date Retirement Fund (RFTTX), which charges an expense ratio of 36 basis points.

365.   Although the R6 share class of the American Funds 2010 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2010 Target Date Retirement Fund in the Plan until 2014.

366.   During the Relevant Period, the Plan has had between $3.2 million and $4.6 million of its assets invested in the American Funds 2010 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $3.4 M |
| 2012 | $3.6 M |
| 2013 | $3.1 M |
| 2014 | $4.6 M |
| 2015 | $3.5 M |
| 2016 | $3.6 M |

367.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2010 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2010 Fund (VTENX) charges an expense ratio of 13 basis points, 68% less than what is charged by the R5 share class of the American Funds 2010 Target Date Retirement Fund, and 63% less than what is charged by the R6 share class of the American Funds 2010 Target Date Retirement Fund.

368.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2010 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2010 Target Date Retirement Fund (R5) | 8.74% | 4.56% | 7.67% |
| American Funds 2010 Target Date Retirement Fund (R6) | 8.70% | 4.62% | 7.71% |
| Vanguard Target Retirement 2010 Fund | 6.42% | 3.80% | 6.21% |

369.   Further, the American Funds 2010 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 35 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (36 basis points) for investments in the R6 share class of the American Funds 2010 Target Date Retirement Fund than if they invested in it outside of the Plan.

370.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2010 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

371.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2010 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

372.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (36 basis points) for the R6 share class

89

of the American Funds 2010 Target Date Retirement Fund than what is listed in the prospectus (35 basis points).

### b.   American Funds 2015 Target Date Retirement Fund

373.   The American Funds 2015 Target Date Retirement Fund is a mutual fund managed by CRMC.

374.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2015 Target Date Retirement Fund (REJTX), which charges an expense ratio of 40 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2015 Target Date Retirement Fund (RFJTX), which charges an expense ratio of 36 basis points.

375.   Although the R6 share class of the American Funds 2010 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2010 Target Date Retirement Fund in the Plan until 2014.

376.   During the Relevant Period, the Plan has had between $7.2 million and $14 million of its assets invested in the American Funds 2015 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $7.2 M |
| 2012 | $9.7 M |
| 2013 | $11 M |
| 2014 | $14 M |
| 2015 | $14 M |
| 2016 | $12 M |

377.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2015 Target Date Retirement Fund were and continue to be well in

90

excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2015 Fund (VTXVX) charges an expense ratio of 14 basis points, 65% less than what is charged by the R5 share class of the American Funds 2015 Target Date Retirement Fund, and 61% less than what is charged by the R6 share class of the American Funds 2015 Target Date Retirement Fund.

378.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2015 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2015 Target Date Retirement Fund (R5) | 9.14% | 4.83% | 8.56% |
| American Funds 2015 Target Date Retirement Fund (R6) | 9.22% | 4.86% | 8.62% |
| Vanguard Target Retirement 2015 Fund | 8.73% | 4.56% | 7.75% |

379.   Further, the American Funds 2015 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 35 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (36 basis points) for investments in the R6 share class of the American Funds 2010 Target Date Retirement Fund than if they invested in it outside of the Plan.

380.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2015 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and

self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

381.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2015 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

382.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (36 basis points) for the R6 share class of the American Funds 2015 Target Date Retirement Fund than what is listed in the prospectus (35 basis points).

### c.   American Funds 2020 Target Date Retirement Fund

383.   The American Funds 2020 Target Date Retirement Fund is a mutual fund managed by CRMC.

384.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2020 Target Date Retirement Fund (RECTX), which charges an expense ratio of 42 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2020 Target Date Retirement Fund (RRCTX), which charges an expense ratio of 37 basis points.

385.   Although the R6 share class of the American Funds 2020 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more

expensive R5 share class of the American Funds 2010 Target Date Retirement Fund in the Plan until 2014.

386.   During the Relevant Period, the Plan has had between $13 million and $43 million of its assets invested in the American Funds 2020 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $13 M |
| 2012 | $18 M |
| 2013 | $24 M |
| 2014 | $39 M |
| 2015 | $43 M |
| 2016 | $42 M |

387.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2020 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2020 Fund (VTWNX) charges an expense ratio of 14 basis points, 66% less than what is charged by the R5 share class of the American Funds 2020 Target Date Retirement Fund, and 62% less than what is charged by the R6 share class of the American Funds 2020 Target Date Retirement Fund.

388.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2020 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds 2020 Target Date Retirement Fund (R5) | 10.01% | 5.22% | 9.62% |

93

| American Funds 2020 Target Date Retirement Fund (R6) | 10.08% | 5.27% | 9.66% |
| Vanguard Target Retirement 2020 Fund | 10.60% | 5.24% | 8.95% |

389.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2020 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

390.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2020 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### d.   American Funds 2025 Target Date Retirement Fund

391.   The American Funds 2025 Target Date Retirement Fund is a mutual fund managed by CRMC.

392.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2025 Target Date Retirement Fund (REDTX), which charges an expense ratio of 44 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2025 Target Date Retirement Fund (RFDTX), which charges an expense ratio of 40 basis points.

393.   Although the R6 share class of the American Funds 2025 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more

expensive R5 share class of the American Funds 2025 Target Date Retirement Fund in the Plan until 2014.

394.  During the Relevant Period, the Plan has had between $16 million and $87 million of its assets invested in the American Funds 2025 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $16 M |
| 2012 | $19 M |
| 2013 | $29 M |
| 2014 | $54 M |
| 2015 | $70 M |
| 2016 | $87 M |

395.  The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2025 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2025 Fund (VTTVX) charges an expense ratio of 14 basis points, 68% less than what is charged by the R5 share class of the American Funds 2025 Target Date Retirement Fund, and 65% less than what is charged by the R6 share class of the American Funds 2025 Target Date Retirement Fund.

396.  While the performance of the Vanguard fund has been comparable to that of the American Funds 2025 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds 2025 Target Date Retirement Fund (R5) | 11.58% | 5.68% | 11.17% |

| American Funds 2025 Target Date Retirement Fund (R6) | 11.65% | 5.74% | 11.22% |
| Vanguard Target Retirement 2025 Fund | 12.00% | 5.59% | 9.77% |

397.   Further, the American Funds 2025 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 39 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (40 basis points) for investments in the R6 share class of the American Funds 2025 Target Date Retirement Fund than if they invested in it outside of the Plan.

398.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2025 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

399.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2025 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

400.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (40 basis points) for the R6 share class

96

of the American Funds 2025 Target Date Retirement Fund than what is listed in the prospectus (39 basis points).

### e.      American Funds 2030 Target Date Retirement Fund

401.   The American Funds 2030 Target Date Retirement Fund is a mutual fund managed by CRMC.

402.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2030 Target Date Retirement Fund (REETX), which charges an expense ratio of 46 basis points. In 2014, the Plan switched to the less expense R6 share class of the American Funds 2030 Target Date Retirement Fund (RFETX), which charges an expense ratio of 41 basis points.

403.   Although the R6 share class of the American Funds 2030 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2030 Target Date Retirement Fund in the Plan until 2014.

404.   During the Relevant Period, the Plan has had between $23 million and $111 million of its assets invested in the American Funds 2030 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $23 M |
| 2012 | $26 M |
| 2013 | $38 M |
| 2014 | $72 M |
| 2015 | $91 M |
| 2016 | $111 M |

405.   The fees charged to Plan participants and beneficiaries for these investments in the 2030 Target Date Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard

Target Retirement 2030 Fund (VTHRX) charges an expense ratio of 15 basis points, 68% less than what is charged by the R5 share class of the American Funds 2030 Target Date Retirement Fund, and 63% less than what is charged by the R6 share class of the American Funds 2030 Target Date Retirement Fund.

406.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2030 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2030 Target Date Retirement Fund (R5) | 13.76% | 6.48% | 12.13% |
| American Funds 2030 Target Date Retirement Fund (R6) | 13.85% | 6.54% | 12.20% |
| Vanguard Target Retirement 2030 Fund | 13.23% | 5.87% | 10.57% |

407.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2030 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

408.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2030 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries

### f.      American Funds 2035 Target Date Retirement Fund

409.   The American Funds 2035 Target Date Retirement Fund is a mutual fund managed by CRMC.

410.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2035 Target Date Retirement Fund (REFTX), which charges an expense ratio of 47 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2035 Target Date Retirement Fund (RFFTX), which charges an expense ratio of 42 basis points.

411.   Although the R6 share class of the American Funds 2035 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2035 Target Date Retirement Fund in the Plan until 2014.

412.   During the Relevant Period, the Plan has had between $19 million and $96 million of its assets invested in the American Funds 2035 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $19 M |
| 2012 | $24 M |
| 2013 | $35 M |
| 2014 | $63 M |
| 2015 | $83 M |
| 2016 | $96 M |

413.   The fees charged to Plan participants and beneficiaries for these investments in the 2035 Target Date Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2035 Fund (VTTHX) charges an expense ratio of 15 basis points, 68%

less than what is charged by the R5 share class of the American Funds 2035 Target Date Retirement Fund and 64% less than what is charged by the R6 share class of the American Funds 2035 Target Date Retirement Fund.

414.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2035 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2035 Target Date Retirement Fund (R5) | 15.36% | 6.95% | 12.56% |
| American Funds 2035 Target Date Retirement Fund (R6) | 15.46% | 6.99% | 12.61% |
| Vanguard Target Retirement 2035 Fund | 14.47% | 6.13% | 11.34% |

415.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2035 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

416.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2035 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

100

### g.     American Funds 2040 Target Date Retirement Fund

417.   The American Funds 2040 Target Date Retirement Fund is a mutual fund managed by CRMC.

418.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2040 Target Date Retirement Fund (REGTX), which charges an expense ratio of 48 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2040 Target Date Retirement Fund (RFGTX), which charges an expense ratio of 42 basis points.

419.   Although the R6 share class of the American Funds 2040 Target Date Retirement Fund was launched on July 27, 2009, the Committee retained the more expensive R5 share class of the American Funds 2040 Target Date Retirement Fund in the Plan until 2014.

420.   At all relevant, the Plan has had between $15 million and $80 million of its assets invested in the American Funds 2040 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|---|---|
| 2011 | $15 M |
| 2012 | $18 M |
| 2013 | $26 M |
| 2014 | $51 M |
| 2015 | $66 M |
| 2016 | $80 M |

421.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2040 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2040 Fund (VFORX) charges an expense ratio of 16 basis points, 66% less than what is charged by the R5 share class of the American

101

Funds 2040 Target Date Retirement Fund, and 61% less than what is charged by the R6 share class of the American Funds 2040 Target Date Retirement Fund.

422.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2040 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2040 Target Date Retirement Fund (R5) | 15.99% | 7.10% | 12.78% |
| American Funds 2040 Target Date Retirement Fund (R6) | 15.91% | 7.14% | 12.80% |
| Vanguard Target Retirement 2035 Fund | 15.79% | 6.36% | 11.84% |

423.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2040 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

424.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2040 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

### h.     American Funds 2045 Target Date Retirement Fund

425.   The American Funds 2045 Target Date Retirement Fund is a mutual fund managed by CRMC.

426.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2045 Target Date Retirement Fund (REHTX), which charges an expense ratio of 49 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2045 Target Date Retirement Fund (RFHTX), which charges an expense ratio of 44 basis points.

427.   Although the R6 share class of the American Funds 2045 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2045 Target Date Retirement Fund in the Plan until 2014.

428.   During the Relevant Period, the Plan has had between $7.4 million and $49 million of its assets invested in the American Funds 2045 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $7.4 M |
| 2012 | $9 M |
| 2013 | $13 M |
| 2014 | $27 M |
| 2015 | $38 M |
| 2016 | $49 M |

429.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2045 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2045 Fund (VTIVX) charges an expense ratio

103

of 16 basis points, 67% less than what is charged by the R5 share class of the American Funds 2045 Target Date Retirement Fund, and 63% less than what is charged by the R6 share class of the American Funds 2045 Target Date Retirement Fund.

430.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2045 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2045 Target Date Retirement Fund (R5) | 16.25% | 7.23% | 12.84% |
| American Funds 2045 Target Date Retirement Fund (R6) | 16.26% | 7.27% | 12.89% |
| Vanguard Target Retirement 2045 Fund | 16.17% | 6.48% | 11.92% |

431.   Further, the American Funds 2045 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 43 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (44 basis points) for investments in the R6 share class of the American Funds 2045 Target Date Retirement Fund than if they invested in it outside of the Plan.

432.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2045 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

104

433.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2045 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

434.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (44 basis points) for the R6 share class of the American Funds 2045 Target Date Retirement Fund than what is listed in the prospectus (43 basis points).

### i.     American Funds 2050 Target Date Retirement Fund

435.   The American Funds 2050 Target Date Retirement Fund is a mutual fund managed by CRMC.

436.   Prior to 2014, the Plan offered the R5 share class of the American Funds 2050 Target Date Retirement Fund (REITX), which charges an expense ratio of 49 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2050 Target Date Retirement Fund (RFITX), which charges an expense ratio of 44 basis points.

437.   Although the R6 share class of the American Funds 2050 Target Date Retirement Fund was launched on July 13, 2009, the Committee retained the more expensive R5 share class of the American Funds 2050 Target Date Retirement Fund in the Plan until 2014.

105

438.   During the Relevant Period, the Plan has had between $6.3 million and $25 million of its assets invested in the American Funds 2050 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $6.3 M |
| 2012 | $6.2 M |
| 2013 | $7.3 M |
| 2014 | $14 M |
| 2015 | $19 M |
| 2016 | $25 M |

439.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2050 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2050 Fund (VFIFX) charges an expense ratio of 16 basis points, 67% less than what is charged by the R5 share class of the American Funds 2050 Target Date Retirement Fund, and 63% less than what is charged by the R6 share class of the American Funds 2050 Target Date Retirement Fund.

440.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2050 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|-----------|--------|---------|---------|
| American Funds 2050 Target Date Retirement Fund (R5) | 16.34% | 7.23% | 12.85% |
| American Funds 2050 Target Date Retirement Fund (R6) | 16.35% | 7.30% | 12.91% |
| Vanguard Target Retirement 2050 Fund | 16.22% | 6.48% | 11.93% |

441.   Further, the American Funds 2050 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 43 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (44 basis points) for investments in the R6 share class of the American Funds 2050 Target Date Retirement Fund than if they invested in it outside of the Plan.

442.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2050 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

443.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2050 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

444.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (44 basis points) for the R6 share class of the American Funds 2050 Target Date Retirement Fund than what is listed in the prospectus (43 basis points).

### j.      American Funds 2055 Target Date Retirement Fund

445.    The American Funds 2055 Target Date Retirement Fund is a mutual fund managed by CRMC.

446.    Prior to 2014, the Plan offered the R5 share class of the American Funds 2055 Target Date Retirement Fund (REKTX), which charges an expense ratio of 50 basis points. In 2014, the Plan switched to the less expensive R6 share class of the American Funds 2055 Target Date Retirement Fund (RFKTX), which charges an expense ratio of 47 basis points.

447.    Although the R6 share class of the American Funds 2055 Target Date Retirement Fund was launched on February 1, 2010, the Committee retained the more expensive R5 share class of the American Funds 2055 Target Date Retirement Fund in the Plan until 2014.

448.    During the Relevant Period, the Plan has had between $413,000 and $11 million of its assets invested in the American Funds 2055 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $413,000 |
| 2012 | $912,000 |
| 2013 | $2 M |
| 2014 | $6.5 M |
| 2015 | $8.2 M |
| 2016 | $11 M |

449.    The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2055 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2055 Fund (VFFVX) charges an expense ratio

of 16 basis points, 68% less than what is charged by the R5 share class of the American Funds 2055 Target Date Retirement Fund, and 65% less than what is charged by the R6 share class of the American Funds 2055 Target Date Retirement Fund.

450.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2055 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2055 Target Date Retirement Fund (R5) | 16.34% | 7.23% | 12.85% |
| American Funds 2055 Target Date Retirement Fund (R6) | 16.36% | 7.28% | 12.89% |
| Vanguard Target Retirement 2055 Fund | 16.22% | 6.42% | 11.89% |

451.   Further, the American Funds 2055 Target Date Retirement Fund's prospectus lists the expense ratio of the R6 share class as 45 basis points. Thus, Plan participants and beneficiaries are charged a higher fee (47 basis points) for investments in the R6 share class of the American Funds 2055 Target Date Retirement Fund than if they invested in it outside of the Plan.

452.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2055 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

453.   Moreover, as noted above, the Committee retained the more expensive R5 share class of the American Funds 2055 Target Date Retirement Fund for several years despite the availability of the less expensive R6 share class, which resulted in Plan participants and beneficiaries paying a higher fee for the very same investment option, because the R5 share class generates more revenue for Capital Group and its subsidiaries.

454.   In addition, as noted above, the Committee's conflicted, disloyal, imprudent, and self-interested decision to put the interests of Capital Group and its subsidiaries ahead of the interests of the Plan and its participants and beneficiaries has resulted in Plan participants and beneficiaries paying a higher fee (47 basis points) for the R6 share class of the American Funds 2055 Target Date Retirement Fund than what is listed in the prospectus (45 basis points)

### k.      American Funds 2060 Target Date Retirement Fund

455.   The American Funds 2060 Target Date Retirement Fund is a mutual fund managed by CRMC.

456.   In late 2014 or early 2015, the American Funds 2060 Target Date Retirement Fund was added to the Plan as an investment option. The Plan offers the R6 share class of the American Funds 2060 Target Date Retirement Fund (RFUTX), which charges an expense ratio of 47 basis points.

457.   During the Relevant Period, the Plan has had between $611,000 and $3.8 million of its assets invested in the American Funds 2060 Target Date Retirement Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2015 | $611,000 |
| 2016 | $3.8 M |

458.   The fees charged to Plan participants and beneficiaries for these investments in the American Funds 2060 Target Date Retirement Fund were and continue to be well in excess of the fees charged by the unaffiliated companies for comparable mutual funds. For example, the Vanguard Target Retirement 2060 Fund (VTTSX) charges an expense ratio of 16 basis points, 65% less than what is charged by the R6 share class of the American Funds 2060 Target Date Retirement Fund.

459.   While the performance of the Vanguard fund has been comparable to that of the American Funds 2060 Target Date Retirement Fund, as illustrated by a comparison of their average month-end returns as of May 31, 2017 in the table below, the lower fees of the Vanguard fund provide for a higher overall return and therefore make it a better investment option for retirement savings.

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| American Funds 2060 Target Date Retirement Fund (R6) | 16.31% | N/A | N/A |
| Vanguard Target Retirement 2060 Fund | 16.20% | 6.42% | 11.89% |

460.   The Committee could have selected and retained a mutual fund comparable to the American Funds 2060 Target Date Retirement Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but it chose not to do so because of its conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries.

### 4.   <u>Commingled Fund/Collective Investment Trust</u>

461.   Collective investment trusts are investment vehicles operated by a bank or trust company that pool assets from groups, individuals, and organizations to develop a larger, diversified portfolio.

111

462.   Until late 2015 or early 2016, the Plan offered the Capital Guardian Emerging Markets Equity Fund—a Capital Group-affiliated collective investment trust—as an investment option.

### a.   Capital Guardian Emerging Markets Equity Fund

463.   The Capital Guardian Emerging Markets Equity Fund is a collective investment trust maintained and managed by CGTC. Pursuant to 29 C.F.R. § 2510.3-101(h), the assets held in a collective investment trust are Plan assets under ERISA.

464.   The Capital Guardian Emerging Markets Equity Fund's investment strategy is to invest primarily in the equity securities of developing countries, or in issuers that are deemed to be suitable because they have or are expected to have significant economic exposure to developing countries through assets, revenues, or profits.

465.   The Capital Guardian Emerging Markets Equity Fund's objective is to provide investors with long-term capital growth.

466.   The Capital Guardian Emerging Markets Equity Fund charges an expense ratio of 110 basis points.

467.   During the Relevant Period, the Plan has had between $108 million and $146 million of its assets invested in the Capital Guardian Emerging Markets Equity Fund, as follows:

| Plan Year | Plan Assets |
|-----------|-------------|
| 2011 | $146 M |
| 2012 | $109 M |
| 2013 | $108 M |
| 2014 | $127 M |
| 2015 | $110 M |

112

468.   The fees charged to Plan participants and beneficiaries for these investments in Capital Guardian Emerging Markets Equity Fund have been well in excess of the fees charged by the unaffiliated companies for comparable collective investment trusts or mutual funds.[11] For example, the Vanguard Emerging Markets Select Stock Fund (VMMSX)—an actively managed mutual fund with a similar investment strategy and objective—charges an expense ratio of 90 basis points, 18% less than what was charged by the Capital Guardian Emerging Markets Equity Fund. The Vanguard Emerging Markets Stock Index Fund (VEMAX)—a passively managed fund with a similar investment strategy and objective—charges an expense ratio of 14 basis points, more than 87% less than what is charged by the Capital Guardian Emerging Markets Equity Fund.

469.   While the performance of the Vanguard funds has been comparable to that of the Capital Guardian Emerging Markets Equity Fund, as illustrated by a comparison of their average month-end returns in the table below, the lower fees of the Vanguard funds

---

[11] A collective investment trust is like a mutual fund, except that it is only sold to institutional investors such as the Plan here. Although collective investment trusts are actively managed, they are subject to less regulatory oversight, have fewer reporting, and disclosure requirements, simpler disclosure statements, smaller prospectuses, and as such, typically cost significantly less than actively managed mutual funds to invest in. Thus, the Committee and/or CGTC could have selected and retained a collective investment trust or mutual fund that was cheaper than the Capital Guardian Emerging Markets Equity Fund, had they utilized an impartial and prudent process for selecting, evaluating, monitoring, and retaining the Plan's investment options. At this time, Plaintiff is unable to provide a comparable collective investment trust because there is very limited publicly available information regarding collective investment trusts. Thus, Plaintiff has provided information concerning the comparable mutual funds. Upon information and belief, however, the Committee and/or CGTC, would have had access to information about comparable collective investment trusts in the course of their respective management of this Plan investment option.

provide for a higher overall return and therefore make them better investment options for retirement savings[12].

| Fund Name | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Capital Guardian Emerging Markets Equity Fund | -6.85% | 2.06% | -0.81% |
| Vanguard Emerging Markets Select Stock Fund | 28.75% | 0.74% | 5.39% |
| Vanguard Emerging Markets Stock Index Fund | 23.98% | 1.40% | 4.18% |

470.   The Committee and/or CGTC could have selected and retained a mutual fund or collective investment trust comparable to the Capital Guardian Emerging Markets Equity Fund for the Plan from an unaffiliated company, such as Vanguard, at a significantly reduced cost to Plan participants and beneficiaries, but they chose not to do so because of their conflicted, disloyal, imprudent, and self-interested decision to select and retain the unduly expensive Capital Group-affiliated investment options that generate revenue for Capital Group and its subsidiaries, including CGTC itself.

## VI.   DEFENDANTS' FIDUCIARY STATUS, GOVERNING SUBSTANTIVE LAW AND DEFENDANTS' UNLAWFUL CONDUCT

## A.   Fiduciary Status Under ERISA.

471.   **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the plan sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

---

[12] As noted in footnote 11, *supra*, there is very limited publicly available information regarding the Capital Guardian Emerging Markets Equity Fund. Thus, the average month-end returns provided in the table herein reflects data from December 31, 2014, which is the most recent data available to Plaintiff.

472.   *De Facto* **Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Pursuant to ERISA, whether someone is a "named fiduciary" is irrelevant to the analysis of the functional fiduciary status. Nor must there be a formal delegation of fiduciary responsibility or a fiduciary role for an individual to be found a fiduciary under the functional test.

**B.   Scope of Fiduciary Status and Liability.**

473.   Both action and nonfeasance can establish ERISA violations. Moreover, often the very same roles, conduct, activities, or failures to act, that establish fiduciary status also will establish substantive ERISA violations.

474.   Corporations and non-human entities or defined groups can only act through their human counterparts. Courts recognize corporate agency principles under ERISA for the purposes not only of determining corporate or entity liability for fiduciary breach, but also for the purpose of determining fiduciary status. Thus, individuals who are also agents of a corporation or entity can act in ways that impose not only personal fiduciary liability on these individuals, but also fiduciary liability on the corporation or entity they represent, or on whose behalf they act.

475.   Further, the doctrine of *respondeat superior* renders entities liable for the fiduciary acts of their employees.

476.   Finally, under basic tenets of corporate law, an entity is imputed with the knowledge that its officers and employees had regarding alleged misconduct, as herein, even if such knowledge is not communicated to the organization.

## C.   The Committee, the Board, and CGTC's Fiduciary Status.

477.   As alleged above, the following factors both establish the fiduciary status of the Committee, the Board, and CGTC with respect to the Plan, as well as speak to their liability for the ERISA violations alleged herein:

A.      The Committee is a named fiduciary of the Plan pursuant to the Plan Document. Plan Document § 17.2(a). The Committee is also a functional fiduciary of the Plan under ERISA because during the Relevant Period it (1) has exercised discretionary authority or discretionary control respecting Plan management, and/or (2) has exercised *any* authority or control respecting management or disposition of the Plan assets, and/or (3) has had discretionary authority or discretionary responsibility in the administration of the Plan.  ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii). In particular, the Committee has been vested with the "exclusive authority and discretion to control and manage the operation and administration of the Plan." Plan Document, § 17.2(a). This authority and discretion includes management of the Plan's investment options. According to the Plan Document, the Committee has full discretionary power and authority to, *inter alia*: (1) select, evaluate, monitor, retain, and remove investment options offered by the Plan; (2) engage actuaries, attorneys, accountants, appraisers, brokers, consultants,

administrators, or other firms or persons and (with its officers, directors and employees); (3) adopt such procedures that are not inconsistent with the Plan or applicable law and amend or revoke any such procedures; (4) construe the Plan and the procedures of the Plan; (5) make findings of fact as necessary to make any determinations and decisions in the exercise of such discretionary power and authority; and (6) delegate any power or duty to any firm or person engaged for reports, advice, opinions, or valuations, or to any other person or persons. *Id.*, §§ 1.25, 15.2. Accordingly, the above-alleged authority of the Committee to *inter alia*, select, evaluate, monitor, and remove the Plan investment options, its authority to engage consultants and other third parties to assist it with Plan management and administration, as well as its authority to delegate any of its powers or duties to any entity or person, render the Committee a functional Plan fiduciary.

B.     The Board is a functional fiduciary of the Plan under ERISA because during the Relevant Period, it (1) has exercised discretionary authority or discretionary control respecting Plan management, and/or (2) has exercised *any* authority or control respecting management or disposition of the Plan assets, and/or (3) has had discretionary authority or discretionary responsibility in the administration of the Plan through its appointment of the members of the Committee. ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii); Plan Document, § 15.1(a) (specifying the Board has the authority and discretion to appoint and remove members of the Committee by resolution).

C.     CGTC is a functional fiduciary under ERISA with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund because

117

during the Relevant Period, CGTC has exercised authority or control respecting the management or disposition of these Plan assets.[13] ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Additionally, CGTC is a functional Plan fiduciary and owed fiduciary duties to the Plan and its participants and beneficiaries under ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii), to the extent CGTC has rendered investment advice for a fee or other compensation, direct or indirect, with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund, or has any authority or responsibility to do so.

## D. Relevant ERISA Law Governing Defendants' Conduct.

### 1. Right of Action.

478.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant, beneficiary, or fiduciary for relief under ERISA § 409, 29 U.S.C. § 1109.

479.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

480.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes participants, beneficiaries, or fiduciaries to bring a civil action "to enjoin any act or practice which

---

[13] As noted in Section V.B.4.a. *supra*, pursuant to 29 C.F.R. § 2510.3-101(h), the assets held in a collective investment trust are Plan assets under ERISA.

violates any provision" of ERISA or the terms of the plan or to obtain "other appropriate equitable relief" to redress such violations or to enforce ERISA or the plan, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, reformation, surcharge, and equitable restitution.

### 2. **Loyalty and Prudence.**

481. The Board, the Committee, and CGTC were bound by the duties of loyalty, exclusive purpose, and prudence, as described below.

482. ERISA § 404(a), 29 U.S.C. 1104(a), charges fiduciaries with the duties of loyalty, exclusive purpose, and prudence. These duties are customarily referred to as the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982). ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides, in pertinent part, that a fiduciary shall discharge his or her duties with respect to a plan "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1) (duty of loyalty), for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan," *id.* § 1104(a)(1)(A) (exclusive purpose duties of loyalty), and with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," *id.* § 1104(a)(1)(B) (duty of prudence).

483. These duties entail, among other things:

(a)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests

of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, their affiliates, or third parties, *Bierwirth*, 680 F.2d at 271;

(b)     The continuing duty to monitor the prudence of investments and whether they are in the best interest of the participants and beneficiaries, and to make changes to investment selections or otherwise address characteristics of investments that are or become disloyal or imprudent. Accordingly, a fiduciary must systematically consider all the investments of the Plan at regular intervals to ensure that they are appropriate, and failure to do so is a breach, regardless of the original date the investment option was selected, *Tibble v. Edison Int'l*, 575 U.S. ---, 135 S. Ct. 1823 (2015); *Tibble v. Edison Int'l*, 135 843 F.3d 1187, 1197 (9th Cir. 2016); and

(c)     The duty to be cost-conscious in incurring reasonable costs in the management of the plan, when monitoring, and reviewing investments, and in devising and implementing strategies for the investment and management of plan assets, *Tibble*, 575 U.S. ---, 135 S. Ct. 1823; *Tibble* 843 F.3d at 1197.

### 3.     Prohibited Transactions.

484.     ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are "party in interest" violations of ERISA § 406(a), 29 U.S.C. § 1106(a). Under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

485.     ERISA's prohibited transaction rules also bar fiduciaries from certain acts because they are self-interested and therefore become *per se* violations of ERISA § 406(b), 29 U.S.C. § 1106(b).

120

486.   ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty.

487.   ERISA § 406(a), 29 U.S.C. 1106(a), provides that transactions between a plan and a party in interest are prohibited transactions, unless they are exempted under ERISA § 408, 29 U.S.C. § 1108:

**(a) Transactions between plan and party in interest**

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

488.   ERISA § 406(b), 29 U.S.C. 1106(b), provides:

**(b) Transactions between plan and fiduciary**

A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account,

121

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### 4.   Co-Fiduciary Liability.

489.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

490.   Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given Plan function, such as the management of a plan investment. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach

122

could occur, but the responsible party could not easily be identified. Co-fiduciary liability

obviates this. Even if a fiduciary merely knows of a breach that it had no connection with,

the fiduciary must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. … [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 5080. Further, a co-fiduciary who enables a breach is liable even

if the co-fiduciary did not know about the breach. *Id.*

### 5.   **The Duty to Monitor.**

491.   A fiduciary that appoints another person to fulfill all or part of its duties, by

formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that

appointee to protect the interests of the ERISA participants and beneficiaries. The power

to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status

upon the person holding such power. Thus, an appointing fiduciary must take prudent and

reasonable action to determine whether the appointees are fulfilling their own separate

fiduciary obligations.

### 6.   **Non-Fiduciary Liability for Participation in Fiduciary Breaches of Loyalty and Prudence and Prohibited Transactions.**

492.   Fiduciary status is not required for liability under ERISA where non-

fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction.

123

Accordingly, Plaintiff makes claims against Capital Group, CRMC, and CII that may have no fiduciary status with respect to the Plan or the ERISA violations alleged herein, but that nevertheless must restore losses or disgorge unjust profits or fees, and/or are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the *Harris Trust* doctrine. *See Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

## VII.   PLAINTIFF LACKED KNOWLEDGE OF MATERIAL FACTS CONCERNING HER PLAN INVESTMENTS

493.   During the Relevant Period, Plaintiff lacked knowledge of all material facts regarding her Plan investments (including, among other things, the conflicted, disloyal, imprudent, and self-interested nature of the Defendants' decisions with regard to the Plan investment options managed by CGTC, CRMC, and/or CII, the availability of cheaper alternative investment options that were not affiliated with Capital Group, the information pertaining to the cost of the Plan's investment options challenged herein as compared to similar investment options from unaffiliated companies, and the Plan's investment options' performance versus the performance of similar lower-priced investment options) necessary to understand that Defendants engaged in unlawful conduct in violation of ERISA, until these facts were revealed in the course of the pre-filing investigation by the undersigned counsel. Furthermore, Plaintiff did not have knowledge of the specifics of Defendants' decision-making process with respect to the Plan (including Defendants' processes and motivations for selecting, evaluating, monitoring, and retaining the Plan's investment options), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences

regarding these processes based upon (among other things) the facts, revealed in the course of her counsel's investigation, as set forth herein.

## VIII.   CLASS ACTION ALLEGATIONS IN THE ALTERNATIVE

494.   As alleged above, Plaintiff brings this action derivatively, on behalf of the Plan, pursuant to ERISA §§ 409, 29 U.S.C. § 1109, and 502, 29 U.S.C. § 1132, and in the alternative, as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1) and/or 23(b)(2), on behalf of the Plan and the following class of similarly situated persons (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between June 13, 2011 and the present (defined above as the "Relevant Period").

495.   The class excludes Defendants, their affiliates, subsidiaries, corporate parents, officers, directors, legal representatives, heirs, successors, predecessors, and assigns.

496.   **Relevant Period.** Plaintiff will seek losses, disgorgement of ill-gotten profits, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113.

497.   **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that the Class includes thousands of participants and/or beneficiaries. For example, according to the Plan's 2015 Form 5500 filed with the DOL, at the end of the Plan year 2016 (ending on June 30, 2016), there were 7,174 participants in the Plan.

125

498.   **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the Board, the Committee, and CGTC are fiduciaries to Plaintiff, the Plan, and other members of the Class;

(b)   whether the Board, the Committee, and CGTC each owed a fiduciary duty under ERISA to Plaintiff, the Plan, and other members of the Class;

(c)   whether the Committee and CGTC breached their fiduciary duties to Plaintiff, the Plan, and other members of the Class by failing to act prudently, solely in the interests of the Plan's participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries; and/or for the exclusive purpose of defraying reasonable expenses of Plan administration;

(d)   whether the Committee and CGTC committed prohibited transactions under ERISA § 406, and if so, how;

(e)   whether Capital Group, the Board, the Committee, CGTC, CRMC, and/or CII otherwise violated ERISA;

(f)   whether Plaintiff, the Plan, and the other Class members have suffered losses and, if so, what is the proper measure of damages; and

(g)   whether Capital Group, CGTC, CRMC, and/or CII are liable to disgorge unjust profits to Plaintiff, the Plan, and the other Class members as a result of their fiduciary breaches or prohibited transactions, and if so, what is the proper measure.

499.   **Typicality.** Plaintiff's claims are typical of the members of the Class because Plaintiff asserts claims on behalf of the Plan pursuant to ERISA §§ 409, 29 U.S.C. § 1109,

and 502, 29 U.S.C. § 1132, for losses and unjust windfalls to the Defendants arising out of the conduct of Capital Group, the Board, the Committee, CGTC, CRMC, and/or CII that was common to all participants and beneficiaries of the Plan affected by the fiduciary breaches and prohibited transactions and, thus, Plaintiff's claims are by definition identical to those of all Class members. Individual cases would require repeated proof of the same claims based on the same conduct of Capital Group, the Board, the Committee, CGTC, CRMC, and/or CII, using the same legal theories, and would seek the same relief.

500.  **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

501.  **Ascertainability.** The Class is ascertainable based on the investment options in which the Plan participants and beneficiaries invested, regarding which, on information and belief, records exist.

502.  **Rule 23(b)(1)(A) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Capital Group, the Board, the Committee, CGTC, CRMC, and/or CII.

503.  **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because, in light of the derivative nature of the claims asserted, prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the individual members of the Class which would, as a

practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

504. **Rule 23(b)(2) Requirements.** Class action status in this ERISA action is warranted under 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE
### Breach of the Fiduciary Duties of Loyalty and Exclusive Purpose

### (Violation of ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. § 1104(a)(1) and (a)(1)(A))

### (Against the Committee and CGTC)

505.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

506.   During the Relevant Period, the Committee acted as a fiduciary with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

507.   During the Relevant Period, CGTC acted as a fiduciary with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

508.   ERISA's duties of loyalty, as set forth above, require fiduciaries to act "solely in the interest of the participants and beneficiaries," ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), and for the "exclusive purpose" of "providing benefits to participants and their

beneficiaries" and "defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A).

509.    The Committee was disloyal in selecting, retaining, and failing to remove the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII. The Committee selected and retained these unduly expensive Capital Group-affiliated investment options because they generate substantial revenue for Capital Group and its subsidiaries when cheaper, comparable investment options were available from the unaffiliated companies. In doing so, the Committee put the financial interests of Capital Group and its subsidiaries above the interests of the Plan and its participants and beneficiaries, and therefore breached its duties of loyalty to the Plan under ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. § 1104(a)(1) and (a)(1)(A).

510.    Further, the Committee was disloyal in selecting, retaining, and failing to remove the more expensive R5 share class of the Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, despite the availability of the cheaper R6 share class. The Committee selected and retained the R5 share class of the Capital Group-affiliated investment options because they generate more revenue for Capital Group and its subsidiaries than the R6 share class. In doing so, the Committee put the financial interests of Capital Group and its subsidiaries above the interests of the Plan and its participants and beneficiaries, and therefore breached its duty of loyalty to the Plan under ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. § 1104(a)(1) and (a)(1)(A).

511.    CGTC was disloyal in investing Plan assets in the unduly expensive Capital Guardian Emerging Equity Fund. CGTC invested Plan assets in the unduly expensive Capital Guardian Emerging Equity Fund because it generates substantial revenue for

CGTC, despite the availability of comparable investment options from the unaffiliated companies. In doing so, CGTC put its financial interests above the interests of the Plan and its participants and beneficiaries, and therefore breached its duty of loyalty to the Plan under ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. § 1104(a)(1) and (a)(1)(A).

512.    As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the investment options managed CGTC, CRMC, and/or CII.

513.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Committee and CGTC are liable to restore all losses suffered by the Plan and its participants and beneficiaries caused by their breaches of fiduciary duty.

## COUNT TWO
### Breach of the Fiduciary Duty of Prudence

### (Violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B))

### (Against the Committee and CGTC)

514.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

515.    During the Relevant Period, the Committee acted as a fiduciary with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

516.    During the Relevant Period, CGTC acted as a fiduciary with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

130

517.   ERISA's duty of prudence, as set forth above, requires fiduciaries to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

518.   The Committee was imprudent in selecting, retaining, and failing to remove the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, when cheaper, comparable investment options were available from unaffiliated companies. A prudent and impartial fiduciary would have reviewed and investigated, on a systematic basis, the availability of less expensive investment options in the marketplace during the Class Period, which would have resulted in the replacement of the more expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII with cheaper, comparable investment options offered by the unaffiliated companies. In failing to do so, the Committee put the financial interests of Capital Group and its subsidiaries above the interests of the Plan and its participants and beneficiaries and therefore breached its duty of prudence to the Plan under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

519.   Further, the Committee was imprudent in retaining the more expensive R5 share class of the Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, despite the availability of the less expensive R6 share class. A prudent and impartial fiduciary would have reviewed and investigated, on a systematic basis, the availability of cheaper share classes during the Class Period, which would have resulted in the replacement of the more expensive R5 share class with the less expensive R6 share

class. In failing to do so, the Committee put the financial interests of Capital Group and its subsidiaries above the interests of the Plan and its participants and beneficiaries, and therefore breached its duty of prudence to the Plan under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

520.   CGTC was imprudent in investing the Plan assets in the unduly expensive Capital Guardian Emerging Markets Equity Fund, when cheaper, comparable investment options were available from the unaffiliated companies. A prudent and impartial fiduciary would have reviewed and investigated, on a systematic basis, the availability of less expensive investment options in the marketplace during the Class Period, which would have resulted in the replacement of the more expensive Capital Guardian Emerging Markets Equity Fund with a cheaper, comparable investment option offered by unaffiliated companies. In failing to do so, CGTC put its financial interests above the interests of the Plan and its participants and beneficiaries, and therefore breached its duty of prudence to the Plan under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

521.   As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII.

522.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Committee and CGTC are liable to restore all losses suffered by the Plan and its participants and beneficiaries caused by their breaches of fiduciary duty.

## COUNT THREE
**Prohibited Transactions Between Plan and Fiduciary**

**(Violation of ERISA § 406(b)(1), (2), and (3), 29 U.S.C. § 1106(b)(1), (2) and (3))**

**(Against the Committee and CGTC)**

523.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

524.   During the Relevant Period, the Committee acted as a fiduciary with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

525.   During the Relevant Period, CGTC acted as a fiduciary with respect to the Plan assets invested in the Capital Guardian Emerging Markets Equity Fund, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

526.   Under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

527.   Under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

528.   Under ERISA § 406(b)(3), 29 U.S.C. § 1106(3), a fiduciary shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

529.   The Committee violated these prohibitions on transactions between a fiduciary and the Plan by selecting, retaining, and failing to remove the unduly expensive

133

Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII that generate significant revenue for Capital Group and its subsidiaries.

530.   CGTC violated these prohibitions on transactions between a fiduciary and the Plan by investing the Plan assets in the unduly expensive Capital Guardian Emerging Markets Equity Fund, for which it received compensation and fees as the investment adviser for this Fund.

531.   As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the conflicted fees of the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII.

532.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), and pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Committee and CGTC must restore to the Plan and its participants and beneficiaries their losses and the unjust profits the Committee and CGTC allowed to be paid to Capital Group and its subsidiaries due to these prohibited transactions.

## COUNT FOUR
### Prohibited Transactions Between Plan and Party In Interest

### (Violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D))

### (Against the Committee)

533.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

534.   During the Relevant Period, the Committee acted as a fiduciary with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

535.   During the Relevant Period, CGTC has been a party in interest with respect to the Plan, within the meaning of ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), because it was an investment adviser with respect to the Plan assets invested in the unduly expensive Capital Guardian Emerging Markets Equity Fund, for which it received fees or other compensation from the assets of the Plan. In addition, during the Relevant Period, CGTC, CRMC, and CII have been parties in interest with respect to the Plan, within the meaning of ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G), because they are subsidiaries of Capital Group and manage the unduly expensive Capital Group-affiliated investment options at issue.

536.   Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if it knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

537.   The Committee violated this prohibition on transactions between the Plan and a party in interest through its actions and omissions in authorizing or causing the Plan to invest in the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, and pay, directly or indirectly, investment management and other fees in connection therewith, which caused the Plan to engage in transactions that the Committee knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of a party in interest, of the assets of the Plan.

538.   As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the excessive fees of the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII.

539.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), as wells as § 502(a)(3), 29. U.S.C. § 1132(a)(3), the Committee is liable to restore all losses suffered by the Plan and its participants and beneficiaries caused by its breaches of fiduciary duty, and the unjust profits the Committee allowed to be paid to Capital Group and its subsidiaries.

## COUNT FIVE
### Failure to Adequately Monitor Other Fiduciaries

### (Violation of ERISA § 404, 29 U.S.C. § 1104)

### (Against the Board)

540.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

541.   During the Relevant Period, the Board acted as a fiduciary with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

542.   As alleged above, the fiduciary responsibilities of the Board included appointing, evaluating, and monitoring other fiduciaries, including, but not limited to, the members of the Committee, to whom certain fiduciary responsibilities were delegated.

543.   ERISA requires that monitoring fiduciaries ensure that their appointees and delegees are performing their fiduciary obligations, including those with respect to the

136

selection and retention of investment options for the Plan and the investment of the Plan's assets. Further, the monitoring fiduciaries must take prompt and effective action to protect a plan and its participants and beneficiaries when they are not doing so.

544.　The Board breached its fiduciary duty to monitor their appointees and delegees by, among other things: failing to disclose conflicts of interest that existed between Capital Group and CGTC, CRMC, and/or CII; failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so; failing to monitor and evaluate the cost of the investment options in the Plan; failing to monitor the processes and policies by which the Plan's investment options were evaluated; and failing to remove fiduciaries whose performance was inadequate, and/or who had engaged in conflicted, disloyal, imprudent, and self-interested conduct.

545.　As a direct and proximate result of the Board's breaches of its fiduciary duty to monitor, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII.

546.　Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Board is liable to restore all losses suffered by the Plan caused by its breaches of fiduciary duties.

### COUNT SIX
### Co-Fiduciary Liability

### (Violation of ERISA § 405, 29 U.S.C. § 1105)

### (Against the Committee, the Board, and CGTC)

547.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

548.   During the Relevant Period, the Committee, the Board, and CGTC acted as fiduciaries with respect to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

549.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he or she knowingly participates in a breach of fiduciary duty of another fiduciary.

550.   The Committee is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it is a named fiduciary and it selected, retained, and failed to remove the unduly excessive Capital Group-affiliated investment options in the Plan, and knew that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings.

551.   CGTC is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it was a fiduciary with respect to Plan assets invested in the unduly expensive Capital Guardian Emerging Markets Equity Fund, and served as the investment adviser of this Fund, and knew that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets invested in this Fund, thereby decreasing the value of the Plan participants' retirement savings.

552.   ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his or her fiduciary responsibilities enables another fiduciary to commit a breach, even without knowledge of the other's breach.

138

553.   The Board is liable under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), because it had a duty to monitor and evaluate the members of the Committee, but failed to do so.

554.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if it knows of a breach by another fiduciary and fails to remedy it. Even if the fiduciary merely knows of a breach that it had no connection with, the fiduciary must take steps to remedy the breach.

555.   The Committee, the Board, and CGTC, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty or prohibited transaction alleged herein arising from the Committee's selection and retention of the unduly expensive Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII, and CGTC's investment of Plan assets in the unduly expensive CG Emerging Markets Equity Fund, participated in each other's violations of ERISA, enabled each other's violations of ERISA, and took no steps to remedy those violations of ERISA. As such, each is liable for the breaches and prohibited transactions of the others pursuant to ERISA § 405(a)(1), (2), and (3), 29 U.S.C. § 1105(1), (2), and (3).

556.   As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the Capital Group-affiliated investment options managed by CGTC, CRMC, and/or CII.

557.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Committee, the Board, and CGTC are liable to restore all losses

139

suffered by the Plan and its participants and beneficiaries caused by their breaches of fiduciary duty.

## COUNT SEVEN[14]

### Non-Fiduciary Participation in Counts I-IV, pursuant to ERISA § 502(a)(3)

### (Against Capital Group, CRMC, and CII)

558.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

559.   Capital Group, CRMC, and CII had actual or constructive knowledge of and participated in and/or profited from the breaches of loyalty alleged in Count One, the breaches of prudence alleged in Count Two, and the prohibited transaction claims alleged in Counts Three and Four, and are liable to disgorge the ill-gotten gains and/or provide other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

560.   Neither fiduciary nor party-in-interest status is required for liability under ERISA where, as here, non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a prohibited transaction. Accordingly, Plaintiff may bring claims against such entities even if they are not found to have fiduciary or party-in interest status themselves.

561.   Capital Group knowingly participated in the breaches of loyalty alleged in Count One by the Committee and CGTC because it is the Plan sponsor and corporate parent of CGTC, CRMC, and CII, as well as the employer of the members of the Committee, and

---

[14] As noted *supra* footnotes 2-4, Plaintiff reserves the right to amend to bring additional claims against Capital Group, CRMC, and/or CII should further investigation or discovery reveal that any of these entities were fiduciaries with respect to the Plan.

therefore knew that these breaches diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings accounts.

562. CRMC knowingly participated in the breaches of loyalty alleged in Count One by the Committee because it is the investment adviser of 42 of the unduly expensive Capital Group-affiliated investment options offered by the Plan, and therefore knew that these breaches diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings accounts.

563. CII knowingly participated in the breaches of loyalty alleged in Count One by the Committee because it is the investment adviser of the unduly expensive CG Emerging Markets Growth Fund, and therefore knew that these breaches diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings accounts.

564. Capital Group knowingly participated in the breaches of prudence alleged in Count Two by the Committee and CGTC because it is the Plan sponsor and corporate parent of CGTC, CRMC, and CII, as well as the employer of the members of the Committee, and therefore knew these breaches would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings.

565. CRMC knowingly participated in the breaches of prudence alleged in Count Two by the Committee because it is the investment adviser of 42 of the unduly expensive investment options offered by the Plan, and therefore knew these breaches would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings.

566.   CII knowingly participated in the breaches of prudence alleged in Count Two by the Committee because it is the investment adviser of the unduly expensive CG Emerging Markets Growth Fund, and therefore knew these breaches would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings.

567.   Capital Group knowingly participated in the violations of ERISA's prohibited transaction provisions under ERISA § 406(b), Count Three, by the Committee and CGTC because it is the Plan sponsor and corporate parent of CGTC, CRMC, and CII, and therefore knew these violations would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings, and result in windfall profits for Capital Group and its subsidiaries.

568.   CRMC knowingly participated in the violations of ERISA's prohibited transaction provisions under ERISA § 406(b), Count Three, by the Committee and CGTC because it is the investment adviser of 42 of the unduly expensive Capital Group-affiliated investment options offered by the Plan, and therefore knew these violations would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings, and result in windfall profits for Capital Group and its subsidiaries.

569.   CII knowingly participated in the violations of ERISA's prohibited transaction provisions under ERISA § 406(b), Count Three, by the Committee and CGTC because it is the investment adviser for the unduly expensive CG Emerging Markets Growth Fund, and therefore knew these violations would diminish the value of the Plan

142

assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings, and result in windfall profits for Capital Group and its subsidiaries.

570.   With regard to Count Four, as alleged above, CGTC, CRMC, and CII are parties-in-interest. Capital Group, CRMC, and CII had actual or constructive knowledge of the circumstances that made its transaction with the Plan violations of ERISA § 406(a). During the Relevant Period, Capital Group was the Plan sponsor and corporate parent of CGTC, CRMC, and CII. During the Relevant Period, CRMC and CII served as investment advisers for and managed a number of the unduly expensive Capital Group-affiliated investment options in the Plan. Therefore, Capital Group, CRMC, and CII knew or should have known they were dealing with a fiduciary, and that the prohibited transactions alleged herein would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' and beneficiaries' retirement savings, and result in windfall profits for Capital Group and its subsidiaries.

571. As a direct and proximate result of the breaches and prohibited transactions alleged in Count One through Count Four, and the participation therein of Capital Group, CRMC, and CII alleged in this Count, the Plan and its participants and beneficiaries lost millions of dollars or their assets were used to generate profits for CGTC, CRMC, and/or CII.

572.   Pursuant to ERISA, Capital Group, CRMC, and CII must disgorge all ill-gotten gains collected from the breaches of fiduciary duty and prohibited transactions alleged herein, as well as the additional profits earned on such funds, and provide other appropriate equitable relief.

## COUNT EIGHT

### Attorneys' Fees and Costs

### (Violation of ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1))

### (Against All Defendants)

573.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

574.   Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

## X.   PRAYER FOR RELIEF

Under ERISA, each Defendant is jointly and severally liable for the losses suffered by Plaintiff and the Plan, the unjust profits collected by Defendants and other entities, and for the relief flowing from the foregoing Causes of Action.

WHEREFORE, Plaintiff prays for judgment against Defendants in the following manner:

A.   declaring that certain of the Defendants are fiduciaries for the purposes alleged here;

B.   declaring that certain of the Defendants have violated ERISA's duty of loyalty;

C.   declaring that certain of the Defendants have violated ERISA's duty of prudence;

D.   declaring that certain of the Defendants have violated ERISA's prohibited transaction provisions;

E.   enjoining Defendants from further such violations;

F.   adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiff and the Plan, remedying Defendants' windfalls, and

144

placing Plaintiff and the Plan in the position that they would have been in if the fiduciaries of the Plan had not breached their duties or committed prohibited transactions;

G.    ordering Defendants to restore all losses to the Plan and disgorge unjust profits;

H.    ordering Defendants to restore all lost investment returns that would have been invested in the Plan but for Defendants' unlawful conduct;

I.    ordering Defendants to pay Plaintiff and the Plan the amount of profits they earned on the funds they misappropriated from the Plan;

J.    ordering constructive trust, surcharge, and equitable restitution, as well as other such equitable monetary relief against Defendants as maybe appropriate;

K.    ordering other such remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the Plan, including as custodians, trustees, and investment managers;

L.    ordering that a common fund be established to distribute losses and other relief back to the Plan;

M.    enjoining Defendants from any further violations of ERISA;

N.    awarding Plaintiff costs and attorney's fees herein;

O.    awarding Plaintiff such other and further relief as to this Court may seem just and proper; and

P.    ordering Defendants to pay all of the foregoing.

DATED this 13th day of June, 2017.

KELLER ROHRBACK L.L.P.


By */s/ Khesraw Karmand*
　　Khesraw Karmand (SBN 280272)
　　kkarmand@kellerrohrback.com
　　801 Garden Street, Suite 301
　　Santa Barbara, CA 93101
　　Telephone: (805) 456-1496
　　Facsimile: (805) 456-1497

　　Derek W. Loeser (*pro hac* motion
　　forthcoming)
　　dloeser@kellerrohrback.com
　　Erin M. Riley (*pro hac* motion forthcoming)
　　eriley@kellerrohrback.com
　　Gretchen S. Obrist (*pro hac* motion
　　forthcoming)
　　gobrist@kellerrohrback.com
　　1201 Third Avenue, Suite 3200
　　Seattle, WA 98101-3052
　　Telephone: (206) 623-1900
　　Facsimile: (206) 623-3384

　　Tanya Korkhov (*pro hac* motion
　　forthcoming)
　　tkorkhov@kellerrohrback.com
　　1140 Avenue of The Americas, 9th Floor
　　New York, NY 10036
　　Telephone: (646) 380-6690
　　Facsimile: (646) 380-6692

　　***Attorneys for Plaintiff***

4816-8804-9738, v. 2

146